UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| LARRY LUNAN, et al. | : | CASE NO. C-1-01-425 |
| Plaintiffs | : | (Judge Weber) |
| vs. | : | |
| MYCOM GROUP, INC., et al. | : | DEFENDANTS' HIGHLIGHTED VERSION OF PLAINTIFFS' |
| Defendants | : | PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| | : | |

/s/ James M. Moore_____

James M. Moore         (#0009476)
Trial Attorney for Defendants, Mycom Group, Inc., Patricia A. Massey, G. Allan Massey, George W. Young, Joan Carroll and Terry Seipelt
312 Walnut Street, Suite 2300
Cincinnati, Ohio 45202-4091
(513) 421-6630  Telephone
(513) 421-0212  Facsimile

Of Counsel:

LINDHORST & DREIDAME
312 Walnut Street, Suite 2300
Cincinnati, Ohio 45202-4091
(513) 421-6630  Telephone
(513) 421-0212  Facsimile

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing has been sent by regular U.S. Mail to Stephen A. Watring, Esq., Dunlevey, Mahan & Furry, 110 N. Main Street, Suite 1000, Dayton, OH 45402-1738; and Matthew D. Davison, Esq., Baker, Donelson, Bearman & Caldwell, 207 Mockingbird Lane, P. O. Box 3038, Johnson City, TN 37602, this 19th day of November, 2003.

/s/ James M. Moore
_____

James M. Moore
Attorney at Law

- 2 -

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| LARRY LUNAN, et al. | : | CASE NO. C-1-01-425 |
| Plaintiffs | : | (Judge Weber) |
| vs. | : | |
| MYCOM GROUP, INC., et al. | : | |
| Defendants | : | |

**PROPOSED FINDINGS OF FACT**

    1.    The plaintiffs, Larry and Susan Lunan (the "Lunans"), are husband and wife and were the principal shareholders, officers and directors of Bad Toys, Inc. ("Bad Toys"), which company was merged into Myca Group, Inc. ("Myca") pursuant to the Plan and Agreement of Merger between Bad Toys and Myca dated March 31, 2000 (the "Merger Agreement") and the Closing Agreement dated August 23, 2000 (the "Closing Agreement") (collectively referred to as the "Merger").

    2.    Defendant Mycom Group, Inc. ("Mycom") is a Corporation existing under the laws of the State of Nevada which is authorized to do business in Ohio and is the surviving entity of the Merger.

    3.    Defendants Patricia A. Massey ("P. Massey"), G. Allan Massey ("A. Massey"), George W. Young ("Young"), and Joan Carroll ("Carroll") were the sole shareholders, officers, and directors of Myca prior to the Merger and were the majority shareholders, officers and directors of Mycom subsequent to the Merger.

    4.    Defendant Terry Seipelt ("Seipelt") acted as an agent of Myca during negotiations between Bad Toys and its shareholders, officers, and directors and Myca and its shareholders, officers, and directors.

    5.    The Lunans were introduced to Myca and its shareholders, officers and directors ("P. Massey, A. Massey, Young, and Carroll) by their attorney, Thomas Keenan, in late January or early February 2000.

    6.    At the time, the Lunans were interested in a potential reverse merger wherein they would essentially sell the public company they had developed (Bad Toys) to a private company wishing to go public.

7. Discussions between the Lunans and Myca and its shareholders, officers and directors (P. Massey, A. Massey, Young and Carroll) led to the signing of the Merger Agreement on March 31, 2000.

8. The Merger Agreement contemplated a private placement offering to be initiated "promptly after execution of" the Agreement and funded before closing of the Merger.

9. In connection with the private placement offering, Paragraph 12(c) of the Merger Agreement provided:

> The net proceeds of the [private placement] offering shall be used by Bad Toys as follows:  (i) $800,000 shall be the cash portion of the consideration paid to the Myca Group shareholders in connection with the Merger as described [herein], (ii) $150,000 shall be paid to Bad Toys Sub to pay existing Bad Toys debt, (iii) $150,000 shall be paid to the Lunans (together with all the Bad Toys Sub outstanding common stock) to extinguish all remaining debts of Bad Toys owed to the Lunans, and (iv) 900,000 shall be retained by Bad Toys for product and service development . . . .

10. P. Massey, who was the lead Myca Shareholder participating in negotiations with the Lunans and Bad Toys, understood when the Merger Agreement was executed that the Lunans would receive $300,000 as compensation for the Merger.

11. Between March 31, 2000 and August 23, 2000, P. Massey spent a limited amount of time trying to arrange for funding of the private placement offering contemplated in the Merger Agreement.

12. P. Massey spent four or five days total in the field working to obtain funding of the private placement offering.

13. During this time, Mr. Lunan was also working to obtain funding, and he encouraged P. Massey to contact some off his potential sources of funding.

14. Mr. Lunan offered to remain involved in the efforts to obtain funding for the private placement offering, but P. Massey refused to permit him to be involved because she understood that it would be better for potential investors to hear just the Mycom story.

15. During the March-to-August timeframe, P. Massey repeatedly encouraged the Lunans to pay the Bad Toys debt in anticipation of the Merger.

16. P. Massey also enlisted Ken Hall, who acted as an Agent of Myca and its shareholders, directors and officers, to communicate with Mr. Lunan about paying outstanding debts of Bad Toys.

17. Seipelt, who was hired as acting CFO by the Myca shareholders in July or early August 2000, also communicated with Mr. Lunan about ensuring the Bad Toys debts were paid before the closing of the Merger.

18. Seipelt was given authority to negotiate on behalf of Myca during the Bad Toys negotiations.

19. Once Seipelt was hired, he reviewed the Merger Agreement and advised P. Massey and the other Myca shareholders, directors and officers that they were paying too much for the Merger with Bad Toys.

20. Seipelt advised P. Massey that Myca should not go forward with the Merger as proposed in the Merger Agreement previously executed.

21. At a meeting held between P. Massey, Carroll, Mr. Lunan, and Seipelt, Seipelt expressed his concerns about the payment the Lunans were to receive for the merger, and Mr. Lunan was adamant, to the point of leaving the room and slamming the door, that unless he received $300,000, he was not going to sell the shell.

22. At about the time of the meeting among Mr. Lunan, Seipelt, P. Massey, and Carroll, the parties were discussing the possibility of Myca providing to the Lunans a note in the amount of $300,000 as a substitute for the contemplated net $300,000 payment the Lunans were entitled to under the terms of the Merger Agreement.

23. These discussions progressed so far as the drafting of a Closing Agreement and other closing documents that included a provision for a note and the drafting of a proposed note.

24. Within days after the meeting at which Mr. Lunan expressed his absolute unwillingness to sell the Bad Toys shell absent payment of $300,000 and the negotiations regarding the proposed note, P. Massey called Mr. Lunan to inform him that they would be receiving funds in the amount of $3 million from Tricorp Financial, Inc. ("Tricorp") pursuant to the private placement offering, and that as a consequence of receiving this money, the Lunans would be paid immediately, alleviating the need for a note.

25. Bad Toys and Mycom entered into a Stock Purchase Agreement with Tricorp on August 14, 2000 by which Tricorp would purchase 6 million shares of stock in the surviving entity for a total payment of $6 million.

26. P. Massey instructed Mr. Lunan to issue 6 million shares of Bad Toys stock to Tricorp pursuant to the Stock Purchase Agreement entered into with Tricorp dated August 14, 2000.

27. Very little due diligence was conducted to investigate the legitimacy of the Tricorp commitment to purchase million shares of stock for $6 million.

28. After the Tricorp funding was "promised" to Myca and its shareholders, officers and directors sought to close the Merger and promised Mr. Lunan that the funding from Tricorp would be in-hand within 3 days after the closing.

29. Once the parties decided to close the Merger, notwithstanding that the private placement offering had not been consummated, the text from paragraph 12(c) of the Merger Agreement was deleted and the following language was substituted in paragraph 5 of the Closing Agreement:

> . . . . Upon the first payment of $3,000,000, as described in the Purchase Agreement, provided that Tricorp does not restrict the Bad Toys' use of funds in any way, (i) the Lunans shall receive payment of $300,000, of which $150,000 shall be paid to the Lunans and $150,000 of which shall be placed in escrow pursuant to the Escrow Agreement of even date herewith; and (ii) each shareholder of Mycom Group shall receive $200,000 or all of the shareholders of Mycom Group shall receive $800,000 in the aggregate.

30. The Closing Agreement between Bad Toys and Myca Group, inc. was executed on August 23, 2000.

31. The Closing Agreement does not contain any provision incorporating the Merger Agreement into the Closing Agreement, nor does it contain an integration clause providing that the Agreement represents the full and final understanding of the parties and that no other oral or written agreements exist.

32. The Closing Agreement does not specifically state that payment of $300,000 for the benefit of the Lunans is contingent upon receipt of funding by Tricorp.

33. P. Massey believed that, pursuant to the terms of the Closing Agreement as executed, if funding from a source other than Tricorp was obtained after the closing, the Lunans would still be paid $300,000.

34. Carroll believed that, pursuant to the terms of the Closing Agreement as executed, if funding from a source other than Tricorp was obtained after the closing, the Lunans would still be paid $300,000.

35. Seipelt believed that, pursuant to the terms of the Closing Agreement as executed, if funding from a source other than Tricorp was obtained after the closing, the Lunans would still be paid $300,000.

36. P. Massey, Carroll, young and Seipelt have each testified inconsistently regarding the right of the Lunans to be compensated as part o the Merger.

37. Tricorp defaulted under the terms of the Stock Purchase Agreement dated August 14, 2000.

38. Neither Myca, nor its shareholders, officers, or directors sought to enforce the Stock Purchase Agreement with Tricorp.

39. When Tricorp defaulted on the Stock Purchase Agreement, the Myca shareholders looked for funding of a sort that would benefit them personally, but would provide no payment to the Lunans.

40. Beginning in mid-to-late September 2000, Mycom began negotiations with Bobbitt & Bransom, Inc. d/b/a Broughton International, resulting in a merger of the two companies in April 2001.

41. As part of this merger, the four original Myca Shareholders sold a combined total of Twenty-Seven Million (27,000,000) shares of their personal Mycom stock to Broughton Acquisition, LLC, resulting in a net payment of $272,167.58 to P. Massey, $217,734.06 to A. Massey, $293,940.98 to Carroll, and $324,827.68 to Young.

42. Mr. Bransom, a principal in Bobbitt & Bransom and Broughton Acquisition, was never informed by Mycom or its shareholders, officers or directors that they considered that the Lunans were still owed $300,000 if Mycom obtained substantial funding.

43. P. Massey and Ken Hall, acting on behalf of Mycom and its shareholders, officers and directors, promised Mr. Lunan that the Bobbitt & Bransom merger would yield payment to the Lunans of $300,000.

44. These promises were made in conjunction with requests for Mr. Lunan to complete payment of Bad Toys' pre-merger debts.

45. Both before and after the Closing Agreement was executed, P. Massey, Seipelt, and Ken Hall repeatedly pressed Mr. Lunan to pay the debts of Bad Toys with the $300,000 payment used as an inducement.

46. Based on representations made by the individual defendant herein, both prior to and after the closing of the Merger, indicating that payment of $300,000 to the Lunans was forthcoming, the Lunans performed their obligations under the Merger Agreement and the Closing Agreement.

47. Additionally, in an effort to facilitate the closing of the Merger, the Lunans paid other obligations of Mycom at the request of the defendants, including but not limited to SEC registration fees and audit fees, in reliance upon representations made by the defendants that the Lunans would be paid $300,000.

48. Mr. Hall, acting on behalf of the Myca shareholders, officers and directors, induced the Lunans to agree to return 500,000 shares of stock and enter into an agreement to restrict the future sale of shares by the Lunans based on the representation that the Lunans would be paid $300,000.

49. The Lunans would never have agreed to pay Bad Toys pre-merger debt or other obligations of the surviving entity, Mycom, if Mr. Lunan had not repeatedly been promised payment of $300,000.

50. In reliance upon the numerous representations made by the defendants, the Lunans have incurred to their detriment great expense in the cancellation of Mycom's debt, the costs of the merger transaction, and restrictions on the transfer of Mycom shares held by the Lunans.

51. Financial Statements prepared for the closing demonstrate that Bad Toys had well over a million dollars of equity, not counting the Tricorp proposed funding.

52. The Lunans have never received any consideration for the debt free public company they built.

53. Mycom and its shareholders, officers and directors have accepted substantial benefits resulting from the Merger.

## PROPOSED CONCLUSIONS OF LAW

### Count I.:  Breach of Contract

1. When two parties have made a contract and have expressed it in a writing to which they have both assented *as the complete and accurate integration of that contract,* evidence, whether parole or otherwise, of antecedent understandings and negotiations will be not admitted for the purpose of varying or contradicting the writing. National City Bank, Akron v. Donaldson, 642 N.E.2d 58 (Ohio Ct. App. 1970).

2. The threshold question in determining whether to consider parole evidence to determine the intent of the parties is whether the written agreement is the complete and unambiguous understanding of the parties. National City Bank, Akron v. Donaldson, 642 N.E.2d 58 (Ohio Ct. App. 1970).

3. The Closing Agreement is ambiguous in its attempt to address the payment of $300,000 for the benefit of the Lunans as consideration in the Merger and does not represent the complete and unambiguous understanding of the parties.

4. Evidence of the parties' conduct and admitted understandings after execution of the Closing Agreement is admissible to show modification of the prior written agreement. See Gerwin v. Clark, 363 N.E.2d 602 (Ohio Ct. App. 1977).

5. A valid agreement existed between Plaintiffs and Defendant Mycom based on oral and written representations wherein Plaintiffs were to receive $300,000 as part of the Merger.

6. Defendant Mycom breached its agreement with the Lunans when it abandoned this agreement and refused to pay the Lunans as represented.

  7. Defendant Mycom is liable to the Lunans for its breach.

  8. As a direct result of Mycom's breach, the Lunans have suffered compensatory damages in an amount exceeding $300,000.

**Count II.:  Fraud**

  9. To establish a claim of fraud a plaintiff must show (a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance.  Russ v. TRW, 570 N.E.2d 1076, 1083 (Ohio 1991).

  10. The individual defendants herein each intentionally and maliciously made false representations to Mr. Lunan regarding payment of $300,000 to the Lunans in consideration for the Merger.

  11. Specifically, Mr. Lunan was told by these individual defendants, subsequent to the closing of the transaction, that the Lunans would be paid $300,000 as agreed if the Lunans extinguished the debt owed by Mycom to the Lunans and others after the merger transaction.

  12. The above false representations were made even though the defendants knew that Mycom would not pay the Lunans $300,000 as agreed.

  13. The above false representations were made with the intent to induce the Lunans to incur substantial expense in extinguishing substantial debt owed by the Defendant Mycom to the Lunans and others.

  14. The Lunans reasonably relied upon the above false representations to their detriment by extinguishing substantial debt owed by the Defendant Mycom to the Lunans and others.

  15. The Lunans have suffered significant monetary damage as a result of their reasonable reliance upon the defendants' false representations.

**Count III.:  Unjust Enrichment**

  16. Unjust enrichment is a concept within contract law that operates to prevent an injustice when one party retains the benefit of another party's efforts without paying fair compensation.  If an express contract exists concerning the services for which compensation is sought, the doctrine of unjust enrichment does not apply in the absence of fraud, bad faith, or illegality.  Absent at least one of these elements, imposition of hardship upon one party or advantage to the other does not relieve the parties from their agreement.  Howland v. Lyons, 2002 WL 3636299, No. 77870 at *3 (Ohio Ct. App. Mar. 7, 2002) (citations to reported cases omitted).

17. The defendants' acceptance of the substantial benefits resulting from the Merger, despite their refusal to pay the Lunans as agreed, has resulted in an unjust enrichment to the defendants.

18. The defendants received control of a debt-free publicly-traded company and have paid no consideration for its shares.

19. The Lunans no longer have control over the public company they build and are in the undesirable position of being minority shareholders with shares that are not freely-transferable due to transfer restrictions imposed thereon as a result of the Merger.

20. The defendants received and accepted a substantial benefit from the Lunans when the Lunans extinguished substantial debt owed by the Defendant Mycom to the Lunans and others before and after the Merger. Defendants have recognized the benefit conferred upon them by the Lunans by representing that the Lunans would be paid $300,000 for the same.

21. The defendants' acceptance of the aforementioned benefits was made under such circumstances that it would be inequitable for Defendants to retain said benefits without payment of the value thereof.

22. The defendants' acted fraudulently, or at least in bad faith, when they attempted to change the terms of the Merger in the last weeks before closing and inserted an attempted limited payment option involving the anticipated Tricorp funding and when no enforcement was sought against Tricorp upon its default but, instead, Mycom entered into a merger with Bobbitt & Bransom wherein P. Massey, A. Massey, Carroll, and Young each personally prospered from the sale of their Mycom shares.

23. The defendants are liable to the Lunans for the value of the benefits each received from the Lunans and accepted without payment, thereby resulting in an unjust enrichment to the defendants.

### Count IV.: Promissory Estoppel

24. A claim of promissory estoppel involves three elements: (1) a clear, unambiguous promise; (2) reasonable and foreseeable reliance upon the promise by the person to whom the promise is made; and (3) resulting injury to the party who relied on the promise. McCroskey v. State, 456 N.E.2d 1204 (Ohio 1983).

25. The defendants' promises to the Lunans that Mycom would pay the Lunans $300,000 as agreed were such that the defendants should have known that said promises would induce the Lunans to take action in reliance upon the same.

26. The Lunans did reasonably act in reliance upon said promises to their detriment by extinguishing substantial debt owed by Mycom to the Lunans and others and by giving up control of the publicly-traded company they had built.

27. As a direct result of the Lunans' detrimental reliance upon the promises of the defendants, the Lunans suffered substantial economic loss, including the amounts paid to extinguish debt owed by Mycom and other costs associated with the Merger.

28. Enforcement of the promises made by the defendants is necessary to avoid substantial injustice. Therefore, the defendants are liable to the Lunans for the loss the Lunans suffered in reasonable reliance upon said promises based on *promissory estoppel.*

### Count V.:  Intentional Interference With Contract

29. A claim for intentional interference with contract must be supported by evidence of (1) the existence of a contract (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) lack of justification, and (5) resulting damages. Kenty v. Transamerica Premium Ins. Co., 650 N.e.2d 863 (Ohio 1995).

30. Defendant Mycom and the Lunans entered into a contract according to which the Lunans were to be paid $300,000 as consideration for the Merger.

31. The remaining defendants knew of the above referenced contract between the Lunans and the Defendant Mycom.

32. The remaining defendants each intentionally procured the breach of the above referenced contract without justification through their intentional and malicious actions causing Mycom not to pay the Lunans as agreed.

33. The Lunans have suffered substantial monetary damages as a result of the defendants' procurement of the breach of the above referenced agreement between the Lunans and Mycom.

### Count VI.:  Civil Conspiracy

34. The tort of civil conspiracy is a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages. Williams v. Aetna Fin. Co., 700 N.E.2d 859 (Ohio 1998).

35. Each of the individuals defendants engaged in a malicious combination to injure the Lunans by conspiring to fraudulently induce the Lunans to extinguish debt on behalf of Mycom and by conspiring to intentionally procure the breach of the contract between the Lunans and Mycom.

36. The Lunans have suffered substantial economic loss as a result of the defendants' conspiracy to commit fraud and conspiracy to intentionally interfere with a contract.

- 12 -

374573-v3