IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION, AT CINCINNATI

| | | |
|---|---|---|
| LARRY LUNAN and SUSAN LUNAN, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. C-1-01-425 |
| | ) | |
| MYCOM GROUP, INC., a Nevada Corporation | ) | JUDGE HERMAN J. WEBER |
| PATRICIA A. MASSEY, G. ALLAN MASSEY, | ) | |
| GEORGE W. YOUNG, JOAN CARROLL, | ) | PLAINTIFFS' HIGHLIGHTED |
| KENNETH R. HALL, and TERRY SEIPELT, | ) | VERSION OF DEFENDANTS' |
| | ) | PROPOSED FINDINGS OF FACT |
| Defendants. | ) | AND CONCLUSIONS OF LAW |

Respectfully submitted,

 /s/ Steven H. Trent
Steven H. Trent, Esq. (TN BPR#016322)
Baker, Donelson, Bearman & Caldwell
207 Mockingbird Lane
P.O. Box 3038
Johnson City, Tennessee 37602
(423) 928-0181

Attorney for Plaintiffs
Larry Lunan and Susan Lunan

CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and exact copy of the foregoing has been served upon the following counsel for parties in interest herein by mailing same as indicated below by United States Mail with sufficient postage thereon to carry same to its destination.

James M. Moore
312 Walnut Street, Suite 2300
Cincinnati, Ohio 45202-4091

This the 24th day of November, 2003.

  /s/ Steven H. Trent

- 1 -

Attorney

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| LARRY LUNAN, et al. | : | CASE NO. C-1-01-425 |
| Plaintiffs | : | (Judge Weber) |
| vs. | : | |
| MYCOM GROUP, INC., et al. | : | PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW OF |
| Defendants | : | DEFENDANTS, MYCOM GROUP, INC., PATRICIA A. MASSEY, G. ALLAN |
| | : | MASSEY, GEORGE W. YOUNG, JOAN CARROLL AND TERRY |
| | : | SEIPELT |

Now come Defendants, Mycom Group, Inc., Patricia A. Massey, G. Allan Massey, George W. Young, Joan Carroll and Terry Seipelt, and pursuant to the Court's Order Instructing Certain Pre-Trial and Trial Procedures, submits the following Proposed Findings of Fact and Conclusions of Law.

**<u>FINDINGS OF FACT</u>**

1. The plaintiffs are citizens of Tennessee and were the principal shareholders of Bad Toys, Inc., which company was merged into defendant Mycom Group, Inc. pursuant to the Plan and Agreement of Merger between Bad Toys, Inc. and Myca Group, Inc. dated March 31, 2000 and the Closing Agreement dated August 23, 2000 (Complaint, Exhibits. A and B, respectively).

2. Defendants, Patricia A. Massey, G. Allan Massey, George W. Young and Joan Carroll, were shareholders, officers and directors of Myca Group, Inc. prior to the merger.

- 3 -

3. Defendant Seipelt is alleged to be an agent of the other individual defendants.

4. As part of the merger, the plaintiffs were to receive $300,000 in return for certain consideration. Plaintiffs allege:

> "15. At the time of the execution of the Closing Agreement referenced above, the Lunans and each of the defendants specifically contemplated and understood that payment of $300,000 to the Lunans was not contingent on any outside occurrence."

5. Plaintiffs do <u>not</u> claim that Tri-Corp Financial, Inc. ever provided any funding to Mycom Group, Inc. Nevertheless, they assert in six Counts (Breach of Contract, Fraud, Unjust enrichment, Promissory Estoppel, Intentional Interference with Contract, and Civil Conspiracy) that they did not receive the sum of $300,000 from the defendants and that the defendants are liable to pay them this amount.

6. In the Answer filed by the defendants, the defendants admitted entering into the agreements which are attached to the Complaint, Exhibits A and B thereto. In their Third Defense, defendants asserted that plaintiffs' actions is barred due to the failure of a condition precedent to any payment obligation of some or all of the defendants in that Tri-Corp Financial, Inc. defaulted on its obligation to purchase the Mycom stock.

7. The defendants also asserted, in their Fourth Defense, that plaintiffs' action is barred due to the provisions of Section 5 of the Closing Agreement dated August 23, 2000.

8. Sometime in late 1999, Kenneth Hall approached the Myca Group shareholders and asked if they would be interested in taking the company public.

9. Initially, Hall stated that he was going to purchase Myca Group as a private investment and take it public.

10. In February of 2001, Kenneth Hall's relationship with Myca Group, Inc. terminated because he didn't produce the funds to take the company public.

11. Hall himself was unable to complete the transaction.

12. Plaintiff, Larry Lunan, was introduced to the Myca shareholders (the Masseys, Young and Carroll) by his attorney, Thomas Keenan.  Lunan was interested in a potential reverse merger.  This was in late January or early February 2000.  During these discussions, the Myca Group shareholders told Lunans that the transaction was always conditioned on a private placement to raise funds and that from those funds both Lunan and the Myca Group shareholders were going to receive a share of the proceeds.  A portion of the proceeds was to go to the company for product development.  The company had insufficient money to pay Lunan unless the private placement were completed.  These discussions led to the signing of the March 31, 2000 Merger Agreement.

13. Larry Lunan's understanding of the merger between Bad Toys, Inc. and Myca Group, Inc. was, he said, that it would result in a payment to him and his wife of $300,000, but he was repeatedly told by the Myca Group shareholders that he would not receive this amount unless outside funding was obtained.

14. The funding for the $300,000 was going to come from Tri-Corp Financial, Inc.

15. None of the anticipated funding was ever raised.

16. Throughout the entire transaction which is the subject of this lawsuit, Lunans were represented by Attorney Thomas Keenan.  There are no covenants, conditions or obligations required by the Agreement with which Myca has not complied.   Lunan

understood that pursuant to the Closing Agreement, dated August 23, 2000, Tri-Corp Financial, Inc., was anticipated to be the source of the $3 Million Dollars which would fund the Merger Agreement between Bad Toys and Mycom).

17. Paragraph 5 of the August 23, 2000 Closing Agreement states: "Upon the first payment of $3 Million Dollars [by Tri-Corp Financial, Inc.] as described in the Purchase Agreement . . . the Lunans shall receive payment of $300,000 . . . ".

18. Tri-Corp Financial, Inc. never made this $3 Million Dollar payment.

19. Larry Lunan and his attorney, Thomas Keenan, had discussions with the Myca Group principals in approximately March 2000.

20. In these conversations, Lunan and Keenan expressed an interest in taking the company public in the absence of Kenneth Hall.

21. However, the Myca Group shareholders were reluctant to do that because the entire premise of the transaction was that the shareholders needed to raise money to fund new products and services to be offered by the company. Ken Hall was initially thought to be the source of that money.

22. Although Lunan told the Myca Group shareholders that it would probably be easier to raise money after rather than before the merger transaction, the Myca Group shareholders were adamant that they were not going to close until the money was raised. The reason for this was that without the money being raised, the Myca Group shareholders did not want to be a public company. In the understanding of the Myca Group shareholders, the whole purpose of being a public company was the ability to raise money to develop products.

23. Lunan assured the Myca Group shareholders that raising a minimum of $2 Million Dollars was going to be very easy, and that with this money each of the original owners of Mycom would receive $200,000 and Lunan would receive $300,000. The remaining $900,000 would be used to grow and develop the company.

24. Ms. Massey told Lunan the only purpose of doing the reverse merger was to be able to raise money to grow and develop the company, and that when they were successful in raising the money Lunan would be paid $300,000.

25. By August, 2000, no money had yet been raised.

26. Lunan proposed that the company agreed to substitute a note payable to him instead of cash in the amount of $300,000, but the Myca Group shareholders rejected this.

27. As of the date of the Closing Agreement, a commitment had been received for the funding from Tri-Corp Financial, Inc. However, Tri-Corp never made any payment pursuant to its commitment.

28. Despite efforts by the Myca Group shareholders, principally Patricia Massey, to obtain outside funding for the company, none was ever raise. Thus, the condition on which the transaction was premised -- that money would be raised to pay not only Lunan and the Myca Group shareholders but a significant amount which would be applied toward development of new products -- was never fulfilled.

29. On April 16, 2001, the Myca Group shareholders sold their personal shares in the company to Broughton Acquisition LLC for the total sum of $1.2 Million Dollars which was to be paid over a 3½ year period. This sale did not result in any capital coming into the company. The April 2001 transaction does not provide a basis for recovery by the plaintiffs of any amount claimed in this civil action.

J M-D 55626 v1
0-0  11/24/2003

30. Because the payment of $300,000 to the plaintiffs was contingent upon outside funding which never materialized, plaintiffs are entitled to no relief.

## CONCLUSIONS OF LAW

### A. Plaintiffs' Breach of Contract Claim

1. The Plaintiffs have alleged in this case that they are entitled to a payment of $300,000 from the Defendants. Their claim is that they would be paid this sum as part of the consideration for the reverse merger transaction which is the subject of the Complaint. The Defendants acknowledge that there was to be a payment totaling $300,000 for the Plaintiffs' benefit, but such payment was contingent upon financing from Tri-Corp Financial, Inc., which defaulted on its obligations to purchase the Mycom stock. This contingency is clearly set forth in the August 23, 2000 Closing Agreement, Section 5 (Complaint, Exhibit "B") which states:

> 5. Bad Toys, Mycom Group and Tri-Corp Financial, Inc. ("Tri-Corp") entered into Stock Purchase Agreement No. 000-BDTY-TSP02 (the "Purchase Agreement") dated August 14, 2000 pursuant to which Tri-Corp shall purchase six million shares of Bad Toys common stock and shall make payment for the stock into payments. <u>Upon the first payment of $3,000,000, as described in the Purchase Agreement,</u> provided that Tri-Corp does not restrict the Bad Toys' use of funds in any way, (i) <u>the Lunans shall receive payment of $300,000,</u> of which $150,000 shall be paid to the Lunans and $150,000 of which shall be placed in escrow pursuant to the Escrow Agreement of even date herewith; and (ii) each shareholder of Mycom Group shall receive $200,000 or all of the shareholders of Mycom Group shall receive $800,000 in the aggregate." (Emphasis applied).

2. There is no dispute in this case that Tri-Corp. never provided all or any portion of the $3,000,000 referenced in the Closing Agreement. Plaintiffs signed this Closing Agreement and they are, therefore, charged with knowledge of its contents.

- 8 -

3.  In addition, Plaintiff Larry Lunan has acknowledged that he was aware that funding from Tri-Corp was to provide, among other things, the funds from which the $300,000 payment to the Lunans would be obtained.

4.  Plaintiffs argue that there were oral statements made that, despite the language of the Closing Agreement, the Lunans would still be paid $300,000 regardless of funding by Tri-Corp. However, the evidence establishes that on numerous occasions the Lunans, who were represented by counsel throughout the transaction, were told that payment to them was conditioned upon the receipt of outside funding which never materialized. The parties did not intend for a payment to be made to the Lunans until this condition was fulfilled, and it never was.

5.  Defendants are entitled to judgment on plaintiffs' breach of contract claim.

B.  **Plaintiffs' Fraud Claim**

6.  Fraud cannot be predicated upon promises or representations relating to future actions or conduct. <u>Tibbs v. National Homes Construction Corp.</u>, 52 Ohio App. 2d 281, 369 N.E.2d 1218. Plaintiffs argue that statements made by defendants concerning the supposedly imminent funding from Tri-Corp constitute the basis for fraud. However, there is no assertion that the defendants represented that Tri-Corp had actually funded the merger. Statements made concerning the future performance by Tri-Corp are not actionable on grounds of fraud.

7.  Also, plaintiffs cannot satisfy the requirement that there be justifiable reliance upon the defendants' statement concerning Tri-Corp's funding of the merger. Both the plaintiffs and the Myca Group shareholders had engaged in efforts from March through August 2000, to secure funding but been unable to raise any money. Although Tri-Corp

- 9 -

ultimately did not come through with the money, either, there is no evidence that the defendants knew, at the time of the Closing Agreement, that Tri-Corp would default.

       8.      Defendants are entitled to judgment on plaintiffs' fraud claim.

**C.**      **Plaintiffs' Claim for Unjust Enrichment**

       9.      A claim for unjust enrichment lies when a benefit is conferred by one party upon another party with knowledge by the second party of the benefit and retention of that benefit by the second party under circumstances where it would be unjust to do so without payment. Hambleton v. R.G. Barm Corp. (1984), 12 Ohio St. 3d 179, 183, 465 N.E.2d 1298, 1301-1302; Katz v. Banning (1992), 84 Ohio App. 3d 543, 552, 617 N.E.2d 729, 735-736.

      10.     In the case at bar, plaintiffs received exactly what they bargained for. They received shares in the merged entity, shares which they own to this date and can sell (and have sold) to others. They did not bargain for the unconditional payment of $300,000. They signed an agreement which expressly made the payment of this money conditional upon receipt of substantial funding, in the amount of $3 Million Dollars, from Tri-Corp.

      11.     Absent fraud or illegality, a party to an express agreement may not bring a claim for unjust enrichment, particularly when the express agreement contains a provision governing the allegedly inequitable conduct of the other party. Aultman Hospital Association v. Community Mutual Insurance Company (1989), 46 Ohio St. 3d 51, 55, 544 N.E.2d 920, 924. Because written contracts existed between the parties here, plaintiffs' claim for unjust enrichment cannot be maintained.

      12.     Defendants are entitled to judgment on plaintiffs' claim for unjust enrichment.

**D.    Plaintiffs' Promissory Estoppel Claim**

13.    None of the elements of promissory estoppel are met in the present case. First, there was no "clear, unambiguous promise" made to the Lunans by the defendants. The promise to pay the Lunans $300,000 was expressly conditioned upon the receipt of funding, which never materialized. Secondly, there was no reasonable and foreseeable reliance upon this promise by the plaintiffs. Funding by Tri-Corp was, at the time of the Closing Agreement, something that was to be hoped-for, perhaps even anticipated, but was not in hand. It was not reasonable or foreseeable, given the plain terms of both the Merger Agreement and the Closing Agreement, that plaintiffs would sign the Closing Agreement with the understanding that they would receive $300,000 regardless of whether outside funding was ever obtained. Finally, the Lunans could not have relied on this so-called promise.

14.    In addition, plaintiffs' promissory estoppel claims are barred by the parol evidence rule. As the Supreme Court of Ohio stated in <u>Ed Schory & Sons, Inc. v. Society National Bank</u> (1996), 75 Ohio St. 3d 433, 440, 662 N.E.2d 1074, 1080:

> "'The Parol Evidence Rule was developed centuries ago to protect the integrity of written contracts.' <u>Shanker, Judicial Misuses of the Word Fraud to Defeat the Parol Evidence Rule and the Statute of Frauds (With Some Cheers and Jeers for the Ohio Supreme Court)</u> (1989), 23 Akron L. Rev. 2. The Parol Evidence Rule is a rule of substantive law that prohibits a party who has entered into a written contract from contradicting the terms of the contract with evidence of alleged or actual agreements. <u>Id.</u>. 'When two parties have made a contract and have expressed it in a writing to which they have both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing.' 3 Corbin, Corbin on Contracts (1960) 357, § 573. See, also, <u>Charles A.</u>

- 11 -

>Burton, Inc. v. Durkee (1952), 158 Ohio St. 313, 109 N.E.2d 265.
>
>As is apparent from the foregoing, the Parol Evidence Rule will not be overcome by merely alleging that a statement or agreement made prior to an unambiguous written contract is different from that which is contained in the contract. Stated differently, 'an oral agreement cannot be enforced in preference to a signed writing which pertains to exactly the same subject matter, yet has different terms.' Marion, supra., 40 Ohio St. 3d 265, 533 N.E.2d 325, ¶ 3 of the syllabus."

The promise which the defendants made to the plaintiffs in the Closing Agreement was that plaintiffs would be paid $300,000 upon receipt of $3 Million Dollars from Tri-Corp. Tri-Corp never paid $3 Million Dollars (nor did anyone else). Since plaintiffs have proffered evidence extrinsic to the written agreement, the Parol Evidence Rule is applicable and plaintiffs' promissory estoppel claim must fail.

15. Defendants are entitled to judgment on plaintiffs' promissory estoppel claim.

E. **Plaintiffs' Claim for Intentional Interference with Contract**

16. Plaintiffs allege that the individual defendants caused the breach of their contract without justification. Plaintiffs have brought this action based upon the Merger Agreement and the Closing Agreement. However, there is no evidence that the defendants breached this contract. Thus the essentials of this cause of action have not been met.

17. Defendants are entitled to judgment on plaintiffs' claim for intentional interference with contract.

F. **Plaintiffs' Claim for Civil Conspiracy**

18. Plaintiffs base this claim upon what they describe as "the underlying claim of fraud." Plaintiffs have not established the necessary elements of fraud. Since this underlying claim must fail, plaintiffs' claim for civil conspiracy must also fail.

19. Defendants are entitled to judgment on plaintiffs' claim for civil conspiracy.

                                                              _____
James M. Moore    (#0009476)
Trial Attorney for Defendants, Mycom Group, Inc., Patricia A. Massey, G. Allan Massey, George W. Young, Joan Carroll and Terry Seipelt
312 Walnut Street, Suite 2300
Cincinnati, Ohio 45202-4091
(513) 421-6630  Telephone
(513) 421-0212  Facsimile

Of Counsel:

LINDHORST & DREIDAME
312 Walnut Street, Suite 2300
Cincinnati, Ohio 45202-4091
(513) 421-6630  Telephone
(513) 421-0212  Facsimile

- 13 -

## **CERTIFICATE OF SERVICE**

    I hereby certify that a copy of the foregoing has been sent by regular U.S. Mail this _____ day of _____, 2003 to the following:

    Stephen A. Watring, Esq. (ORN# 0007761)
    Dunlevey, Mahan & Furry
    110 N. Main Street, Suite 1000
    Dayton, Ohio  45402-1738
    (937) 223-6003

    and

    Steven H. Trent, Esq., (TN BPR #06322)
    Matthew D. Davison, Esq. (TN BPR# 020049)
    Baker, Donelson, Bearman & Caldwell
    207 Mockingbird Lane
    P. O. Box 3038
    Johnson City, Tennessee  37602
    (423) 928-0181

    Attorneys for Plaintiffs, Larry Lunan and
    Susan Lunan

    _____
    James M. Moore
    Attorney at Law