UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| LARRY LUNAN, et al. | : | CASE NO. C-1-01-425 |
| Plaintiffs | : | (Judge Weber) |
| vs. | : | |
| MYCOM GROUP, INC., et al. | : | DEFENDANDANTS' POST-TRIAL BRIEF AND PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF |
| Defendants | : | LAW |

Now come defendants, Mycom Group, Inc., Patricia A. Massey, G. Allan Massey, George W. Young, Joan Carroll and Terry Seipelt, and submit the following Post-Trial Brief and Proposed Findings of Fact and Conclusions of Law.

## THE ISSUE FOR TRIAL

In the Court's Order (Doc. 42) on Defendants' Motion for Summary Judgment, docketed on October 25, 2002, the Court determined that parol evidence is admissible "on the issue of whether the parties agreed that plaintiffs would receive a payment of $300,000 regardless of whether Tri-Corp provided outside funding for the merger." Order at 16.

## TRIAL TESTIMONY

Trial testimony on this issue was in conflict. Mr. Lunan testified that Patricia Massey told him prior to the signing of both the Merger Agreement (Joint Exhibit I) and the Closing Agreement (Joint Exhibit II) that he would be paid $300,000 even if private placement funding was never obtained (Tr. 122). Mr. Lunan further stated that Ken Hall, whom he characterized as "agent" for the Myca Group shareholders, told him in July, August, September and October, 2000, that Lunan would be paid his $300,000 regardless of whether the private placement funding was ever obtained (Tr. 129).

However, Mr. Lunan also testified at trial that Terry Seipelt told him that he would <u>not</u> be paid his $300,000 (Tr. 128), and that at the time this statement was made to him by Seipelt, Lunan considered Seipelt to be an agent of the corporate defendant, Mycom (Tr. 133).  In addition, Ken Hall testified that he made no representations to Lunan about the payment of $300,000 (Tr. 225).  Hall said that he was never given any authority by the Myca shareholders to change the terms of any agreements they had signed with Lunan (Tr. 222).  Regarding Exhibit 44, a letter dated July 21, 2000, sent by Hall to Lunan, in which he stated, on page 2:  "I think I can get support from the Mycom Partners but we are not going to send anything to them until it can be sent from Tom Keenan," Hall said he thought the Myca shareholders would agree to what he was proposing, namely, a reduction in the number of shares and a lockdown and dribble agreement, but he did not know whether they would agree and, further, that the Myca shareholders had not specifically authorized the proposal Hall was making to Lunan (Tr. 224).

Patricia Massey testified that at the first meeting with Mr. Lunan and his lawyer, the Myca shareholders were adamant in saying that the only reason they would consider going public was to raise capital to develop and expand their company.  Ms. Massey denied ever saying to Mr. Lunan prior to his signing the Merger Agreement that he would be paid $300,000 regardless of whether outside funding was obtained for the company (Tr. 163).

In addition, Ms. Massey testified that "several times" between March 31, and August 23, 2000, in discussions with Mr. Lunan concerning whether he would be paid $300,00, "in every conversation we had I would always say we are going to give you your $300,000 when we receive the funding.  It was all predicated on getting funding." (Tr. 167).  Ms. Massey also testified that neither she nor any of the other Myca Group shareholders ever made a statement to Mr. Lunan that he would receive $300,000 regardless of whether

outside funding was obtained. (Tr. 168). She also stated that she had never represented to anyone that Ken Hall had the authority to commit the Myca Group shareholders to any terms and conditions of a merger agreement (Tr. 167).

The Court should find that it was the parties' intention, as expressed in the Merger Agreement and the Closing Agreement, that Mr. Lunan was not to receive a payment of $300,000 unless and until funding from Tri-Corp materialized. The whole purpose of going public, from the Myca shareholders' perspective, was to obtain money to develop and expand the company's product and service offerings. They wanted to raise money by way of a private placement memorandum and Mr. Lunan testified at trial that he was not opposed to this (Tr. 43). Mr. Lunan also acknowledged at trial that after the discussions with Ken Hall had failed, the Myca Group shareholders told Lunan that if they merged with his company, they could not afford to pay Lunan either his $150,000 directly or the additional $150,000 for his assumption of Bad Toys' debts (Tr. 45). Despite this knowledge, the Lunans signed the Merger Agreement and the Closing Agreement. Those two documents fully and completely expressed the parties' intentions. The Merger Agreement sets forth the Covenants of the Parties in paragraph 12. In paragraph 12(c), the Lunans and the Myca Group shareholders agreed that:

> "Promptly after the execution of this Agreement, Bad Toys shall initiate a private placement . . . with the goal of realizing net proceeds of at least Two Million Dollars . . . The . . . net proceeds of the [private placement] offering shall be used by Bad Toys as follows: (i) $800,000 shall be the cash portion of the consideration paid to the Myca Group shareholders in connection with the merger . . . (ii) $150,000 shall be paid to Bad Toys Sub to pay existing Bad Toys debt, (iii) $150,000 shall be paid to the Lunans . . . and (iv)$900,000 shall be retained by Bad Toys for product and service development . . ."

Thus, it can be concluded under the Merger Agreement that the parties intended that, through a private placement offering, certain funds would be raised. The stated goal

was $2 Million Dollars and the money thus raised was to paid to the Myca Group shareholders, the Lunans, to Bad Toys Sub, and to the merged entity in the amounts indicated.  Specifically, with request to the $900,000 to be retained by Bad Toys, the parties expressed that this amount was to be used "for product and service development."

According to Patricia Massey, the Myca Group's revenues and expenses for the years 1998 and 1999 were about equal.  The company had a plan to cause it to grow by using technology code which the company had created.  However, the company could not develop as it wanted because it did not have the capital to do it.  (Tr. 157)  Although their company was not profitable, it did have perceived value:  "We had an on-going business opportunity that had code, software code.  We had talent.  We had opportunity."  (Tr. 178)

George Young testified that in the mid-1990s, 70% to 80% of their company's revenue was from Procter & Gamble (Tr. 204).  In July of 1999, Procter & Gamble placed a moratorium on its spending for information technology development.  The Myca Group shareholders knew that this moratorium by Procter & Gamble would "really hurt our business, not only the technology business but also our communications and marketing business because it was also tied to the technology."  However, the Myca Group shareholders also knew that once the technology moratorium was lifted, business would start to pick up again and the company wanted to get itself into a position where it could still maintain its competitive edge.  (Tr. 205).  This, plus the desire to develop new products, was why the shareholders were seeking outside funding (Tr. 206).

The "perceived value" of the Myca Group, referred to by Patricia Massey and George Young, was precisely what caused Mr. Lunan to want to merge his unprofitable motorcycle business into Myca Group, despite being expressly advised by the Myca Group shareholders that they could not pay the $300,000 he wanted for his public shell unless and

until outside funding had been obtained.  Mr. Lunan testified that Myca Group was touted as an extremely good company with excellent potential and that, as a result, he was convinced that he would be a substantial benefactor if Myca Group merged with his company, since he would be retaining a significant percentage of saleable shares in the merged entity (Tr. 42).

Throughout this litigation, plaintiffs have maintained that the defendants received control of a publicly-traded company with no debt and paid no consideration for its shares, leaving the Lunans in the "undesirable position of being a minority shareholder with shares that are not freely-transferable due to the transfer restrictions imposed thereon as a result of the merger transaction."  (Complaint, ¶ 33).  In fact, however, the trial testimony established that the plaintiffs have benefited significantly from the merger transaction.  The Lunans' company, Bad Toys, Inc. was started in April 1995 (Tr. 21) for the purpose of making motorcycles and marketing them nationally (Tr. 22).  It was not a profitable business entity (Tr. 24).  Top revenue of the company was $87,000 in 1999 or 2000.  During the entire course of the business of Bad Toys, Inc., the company sold not a single motorcycle (Tr. 25).

Immediately prior to the signing by the plaintiffs of the Merger Agreement in March 2000, the share price on average of Bad Toys, Inc. was sixty cents or seventy cents (Tr. 111).  When the Merger Agreement was announced, the stock "flew to -- we traded a million shares, went to -- I think we hit a high of $3.75."  In other words, the share price immediately sustained a significant increase, and the price stayed in the two-and three-dollar range at least through the time the Closing Agreement was signed in August of 2000 (Tr. 112).  The Lunans owned slightly over four million shares of Bad Toys, Inc., going into the Merger Agreement (Tr. 113), and the rise in the share price was the direct result of the

- 5 -

merger of Bad Toys, Inc., with Myca Group (Tr. 115).  Even after significant sales by the plaintiffs to third parties of shares in the merged entity, the Lunans still retain a large number of shares, which are no longer subject to the Lockup and Dribble Agreement[1] (Tr. 146-147).  In addition, Mr. Lunan testified as follows concerning the amount of money he and his wife have received as a result of their sales of shares in the merged entity:

> The Court:  Out of the shares from these three companies, we've been talking about, that you've sold shares and received approximately a million dollars for them?
>
> The Witness:  That's correct.  (Tr. 148).

George Young testified at trial succinctly in answer to plaintiffs' question:  "What consideration did Mr. Lunan get for his majority interest in a publicly traded corporation?":  "Answer.  He got four and a half million shares of free-trading stock that was inflated as a result of the merger between the two companies, and they leveraged the potential of Mycom to sell the stock at a high price.  I mean, that's what he got."  (Tr. 213).

The Merger Agreement required that the private placement funding be in place before the closing.  Patricia Massey testified at trial that Larry Lunan told the defendants that he felt that it would be an easy thing to raise the money to fund the new public company.  Lunan was planning to be involved with the fundraising from the very beginning because "we would not have done this if he [Lunan] were not involved because we did not know how to do it."  (Tr. 161).  Larry Lunan was involved in the effort to obtain funding and the defendants "continued to encourage and support his efforts in making contacts on our behalf.  He talked with Al Kau [a potential investor] probably just as much as I did."  (Tr. 180).

---

1 The Lockup and Dribble Agreement (Joint Exhibit XI(2)) allowed Lunan to sell 5,000 shares per day from the date of the merger through November 11, 2000 and 6,000 shares per day through November 30, 2001, after which his shares were not restricted, or about 100,000 shares per month August 2000 - November 2000, and 120,000 shares per month for the next year.  Joint Exhibit XI(2), paragraphs 3.1, 3.3.

In August 2000, it appeared that outside funding would become available from Tri-Corp Financial, Inc., and on August 14, 2000, the parties entered into a Stock Purchase Agreement (Joint Exhibit III).  This Stock Purchase Agreement was signed by the President of Tri-Corp Financial, by Larry Lunan as President of Bad Toys, Inc. and by Joan Carroll as President of Mycom Group, Inc.  The Stock Purchase Agreement stated that "Bad Toys, Inc. and Mycom Group, Inc., represent to Buyer [Tri-Corp Financial] that they are in the process of closing a merger between them . . . " (emphasis supplied).  The agreement provided that "subject to the merger being effected between Bad Toys, Inc. and Mycom Group, Inc." Tri-Corp agreed to purchase six million newly issued shares of the merged entity for the price of One Dollar per share.  Tri-Corp agreed to make payment for the stock in two payments:  "The first payment for fifty percent of the Stock Purchase amount will be made within five (5) business days of the delivery of the Stock," and "the second payment for the other fifty percent of the Stock Purchase amount will be made within five (5) business days of the date that the registration of the Stock for its resale becomes effective."  (Joint Exhibit III, ¶ 1b).

When Tri-Corp was secured as a source of funding, Patricia Massey called Larry Lunan and told him that the funding had come through and that he would receive his money from the proceeds.  Lunan had been requesting that the defendants give him a promissory note for $300,000, absent outside funding, but the defendants never signed any note. When it appeared that Tri-Corp would provide the necessary funding, Patricia Massey told Larry Lunan that there would be no need for a promissory note (Tr. 194).  At that point, the parties prepared and signed the Closing Agreement dated August 23, 2000 (Joint Exhibit II).  The Closing Agreement expressed the intentions of the parties to effectuate their

merger but to place a contingency on the plaintiff's receipt of $300,000.  This contingency is

clearly set forth in Section 5 of the Closing Agreement which states:

> "5.  Bad Toys, Mycom Group and Tri-Corp Financial, Inc. ("Tri-Corp") entered into a Stock Purchase Agreement No. 000-BDTY-TSP02 (the "Purchase Agreement") dated August 14, 2000 pursuant to which Tri-Corp shall purchase six million shares of Bad Toys common stock and shall make payment for the stock in two payments.  <u>Upon the first payment of three million dollars, as described in the Purchase Agreement</u>, provided that Tri-Corp does not restrict the Bad Toys' use of funds in any way, (i) <u>the Lunans shall receive payment of $300,000</u>, of which $150,000 shall be paid to the Lunans and $150,000 of which shall be placed in escrow pursuant to the Escrow Agreement of even date herewith; and (ii) each shareholder of Mycom Group shall receive $200,000 or all of the shareholders of Mycom Group shall receive $800,000 in the aggregate."  (Emphasis supplied).

The Closing Agreement also stated, in the conclusion of paragraph 1 (Joint Exhibit II,

page 3) that:

> "Except as set forth in subsections 1(a) through 1(j), above, and the paragraph immediately above, the provisions of the Merger Agreement are not affected by this Closing Agreement and shall remain in full force and effect."

The Merger Agreement itself contains an integration clause.  In paragraph 28 (Joint

Exhibit I, page 29) it is stated:

> "28.  Entire Understanding.  The terms set forth in this Agreement including its Exhibits are intended by the parties as the final, complete and exclusive expression of the terms of their agreement and may not be contradicted, explained or supplemented by evidence of any prior agreement, any contemporaneous oral agreement or any consistent additional terms . . . "

The Stock Purchase Agreement (Joint Exhibit III) provided for payment to be made

to the Lunans within five days of delivery of the Mycom stock to Tri-Corp, and Larry Lunan

acknowledged this in his trial testimony.  (Tr. 118).  He also acknowledged that Patricia

Massey never represented to him that she actually had in hand any money from Tri-Corp,

and he admitted that he knew that it was possible that Tri-Corp would not pay as required by the Stock Purchase Agreement (Tr. 119).

Mr. Lunan testified at trial that the Closing Agreement, Joint Exhibit II is the "final document" memorializing the closing on August 23, 2000 (Tr. 92). This testimony by Mr. Lunan was consistent with the testimony of Terry Seipelt:

> The Court: From your experience in this type of a transaction, it's the Closing Agreement that is the binding agreement between the parties?
>
> The Witness: Yes.
>
> The Court: All right. Now, this Closing Agreement incorporates the Merger Agreement in its terms?
>
> The Witness: Yes.
>
> The Court: So then the binding agreement between this party is found in the Closing Agreement and the Closing Agreement, of course, as embellished, if you will, by the Merger Agreement?
>
> The Witness: That's correct. (Tr. 262-263).

Tri-Corp Financial defaulted on its commitment to make payment under the terms of the Stock Purchase Agreement, and Patricia Massey testified that she advised Larry Lunan of this default (Tr. 175).

On the basis of the foregoing, defendants submit that the evidence adduced at trial establishes that it was the intention of the parties to the Merger Agreement and the Closing Agreement that payment to the plaintiffs in the amount of $300,000 as alleged in the complaint was contingent upon receipt by the Myca Group shareholders of funding from Tri-Corp Financial. Tri-Corp Financial did not pay all or any portion of the $6 Million Dollars it agreed to pay under the terms of the Stock Purchase Agreement, Joint Exhibit III.

Plaintiffs are thus entitled to no relief and judgment should be entered in favor of the defendants.

## ARGUMENT

## Defendants are Entitled to Judgment on Plaintiffs' Breach of Contract Claim

In order to establish a claim for breach of contract, plaintiffs must show the existence of a contract, performance by the plaintiffs, breach by the defendants, and resulting damage or loss to the plaintiffs.  Doner v. Snapp, 98 Ohio App. 3d 597, 649 N.E.2d 42 (1994).  The Lunans' breach of contract claim must fail because they have failed to prove by a preponderance of the evidence that defendants breached the terms of the Merger Agreement or the Closing Agreement.  The defendants were not obligated to pay the Lunans $300,000 until Tri-Corp Financial paid the defendants $3 Million Dollars.  Tri-Corp's default in payment removed the requirement that defendants pay the Lunans $300,000.

The Court's previous decision overruling the defendants' motion for summary judgment permitted plaintiffs to present parol evidence on the issue whether Tri-Corp's payment was a condition precedent to the plaintiffs' receipt of $300,000.  Essentially, plaintiffs' evidence on this issue consisted of the repeated self-serving statement of Larry Lunan that he was, indeed, told that he would receive $300,000 regardless of whether outside funding to Myca Group/Mycom was obtained.  His statements in this regard are contradicted by the terms of the Merger Agreement and the Closing Agreement, to say nothing of the testimony of Patricia Massey.  Mr. Lunan's claim that Ken Hall, as "agent" for the defendants, told him as much, was flatly denied by Hall.  Lunan signed the Stock Purchase Agreement with Tri-Corp (Joint Exhibit III) which clearly stated that Tri-Corp would pay five days after the Closing Agreement was signed.  Lunan knew, and he admitted it on the witness stand, that it was at least possible that Tri-Corp might not make

good on its commitment, yet he went forward with the Closing Agreement.  He tried to get the Myca Group shareholders to give him a promissory note, but they refused.  And why?  Because the company could not afford to take on additional debt, something which Lunan well knew, and, just as important, the whole purpose in going public was to cause an infusion of cash into the company so it could capitalize on its technical expertise to offer new products and services.  Without this cash, there was no point in going forward.

The principal purpose of the parol evidence rule is to protect the integrity of written contracts.  Ed Schory & Sons, Inc. v. Society National Bank, 75 Ohio St. 3d 433, 440, 662 N.E.2d 1074, 1080 (1996).  The parol evidence admitted in this case confirms that the parties' intentions are, indeed, fully and completely expressed in the Merger Agreement and in the Closing Agreement.   Accordingly, defendants are entitled to judgment on plaintiffs' claim for breach of contract.

**Defendants are Entitled to Judgment on Plaintiffs' Fraud Claims**

The elements of a claim for fraud are:  (a) representation or, where a duty to disclose exists, a concealment, of a fact; (b) which is material to the transaction at hand; (c) made falsely, with knowledge of its falsity, or utter disregard or recklessness as to its truth or falsity; (d) with the intent of misleading another into relying upon it; (e) a justifiable reliance upon the representation or concealment; and (f) a resulting injury proximately caused by the reliance.  Cohen v. Lamko, 10 Ohio St. 3d 167, 462 N.E.2d 407 (1984).

Plaintiffs have not established that the defendants made any knowingly false representation of fact.  Plaintiffs were told by the defendants that he would not receive his $300,000 unless outside funding was obtained.  Mr. Lunan knew that Patricia Massey was traveling to the west coast and elsewhere to try to get this funding, and he was himself in contact with Al Kau in this effort.  Why was Patricia Massey spending this effort if the

receipt of funding from outside sources were not in fact vital to the transaction which Lunan himself had proposed to the Myca Group shareholders? It was Lunan who told the defendants that "it would be an easy thing to raise the money to fund the new company." (Tr. 161). The evidence adduced in the case at trial does not support the plaintiffs' claim that they were induced by fraud to enter into the Merger Agreement and Closing Agreement. The only other potential source of evidence to support their claim for fraud has to do with Tri-Corp. However, Larry Lunan testified that he has never even claimed that the defendants, Patricia Massey in particular, told him that she actually had Tri-Corp's money in hand when the Closing Agreement was signed by the plaintiffs ("I don't think I've ever made that allegation" -- Tr. 119).

Because plaintiffs have not established the elements of a claim for fraud, defendants are, therefore, entitled to judgment on this claim.

## Defendants are Entitled to Judgment on Plaintiffs' Claims for Unjust Enrichment

The doctrine of unjust enrichment is that a person will not be allowed to profit or enrich himself inequitably at another's expense. Fairfield Ready Mix v. Walnut Hills Associates, Ltd., 60 Ohio App. 3d 1, 3, 572 N.E.2d 114, 116 quoting Freedline v. Cielensky (1961), 115 Ohio App. 138, 184 N.E.2d 433. An action for unjust enrichment will lie where a party retains money or a benefit that in equity or justice belongs to another. Eyerman v. Mary Kay Cosmetics, Inc., 967 F.2d 213, 222 (6th Cir. 1992) (citing Hummel v. Hummel, 133 Ohio St. 520, 524, 14 N.E.2d 923, 926-27 (1938). Throughout this case, the plaintiffs have suggested that the defendants cheated him out of his business. But the facts, as established at trial, demonstrate precisely the opposite. Larry Lunan's public company was a motorcycle business which in five years of operation had never sold a motorcycle and had annual revenues which did not exceed $87,000. Lunan approached the defendants,

who were uninformed of the "reverse merger" industry, and convinced the defendants that they could achieve their goal of obtaining outside funding to expand their business if they agreed to merge with Lunan's Bad Toys, Inc.  That business had stock which was selling for sixty or seventy cents per share immediately prior to the Merger Agreement being signed in March 2000.  Immediately afterward, the value of those shares (4½ million of which were owned by the Lunans) shot up to $3.75 and stayed in the $2 - $3 range through the date the Closing Agreement was signed.  Lunan was able to sell hundreds of thousands of dollars worth of the newly-enriched shares in his business, solely because of his merger with Myca Group, a company which the market place obviously felt had real value.

Thus, it is the plaintiffs, not the defendants, who were unjustly enriched by this transaction.  Larry Lunan walked away with $1 Million Dollars.  The defendants lost their company and their jobs and the salaries that went with them, to say nothing of the fact that Mr. Lunan has gone back into the motorcycle business with a new company bearing the old Bad Toys name.  He said that if he chooses, he can "reverse merger" that company and he stands to gain $6 Million Dollars.

In addition to the foregoing, it is well-established that Ohio law does not permit recovery under the theory of unjust enrichment when an express contract covers the same subject.  Ullman v. May, 147 Ohio St. 468, 72 N.E.2d 63 (1947); see also Klusty v. Taco Bell Corp., 909 F. Supp. 516, S.D. Ohio 1995; David & Tatera, Inc. v. Gray-Syracuse, Inc., 796 F. Supp. 1078 (S.D. Ohio 1992).  Because the parties have an express contract which covers the $300,000 at issue, plaintiffs are not entitled to pursue a claim for unjust enrichment.

For the foregoing reasons, defendants are entitled to judgment on plaintiffs' unjust enrichment claim.

**Defendants are Entitled to Judgment on Plaintiffs' Promissory Estoppel Claim**

The elements of a promissory estoppel claim in Ohio are: (1) a clear, unambiguous promise; (2) reasonable and foreseeable reliance upon the promise by the person to whom the promise is made; and (3) resulting injury to the party who relied on the promise. McCroskey v. State, 8 Ohio St. 3d 29, 456 N.E.2d 1204 (1983). Plaintiffs are not entitled to recovery on their promissory estoppel claim because they have not established that a clear unambiguous promise was made to them by the defendants concerning the payment of $300,000 that they would be paid regardless of whether outside funding was obtained. That payment was always contingent upon the receipt of outside funding which never materialized. Larry Lunan signed a document, the Stock Purchase Agreement, with Tri-Corp Financial that stated, in essence, that Tri-Corp would in the future (five days subsequent to the signing of the Closing Agreement) make a payment of $3 Million Dollars. This is not a "clear, unambiguous promise" upon which plaintiffs were justified in relying. Lunan admitted on the stand that he knew it was possible that Tri-Corp would not make the payment that it said would make under the Stock Purchase Agreement. Finally, plaintiffs have not established that the defendants ever promised them that they would receive $300,000 regardless of whether outside funding was not obtained.

For these reasons, defendants are entitled to judgment on plaintiffs' promissory estoppel claim.

**Defendants are Entitled to Judgment on Plaintiffs' Claim for Intentional Interference with Contract**

In order to prevail on a claim for intentional interference with contract, plaintiffs must establish (1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach; (4) lack of justification, and (5) resulting damages. Kenty v. Transamerica Premium Insurance Company, 72 Ohio

St. 3d 415, 650 N.E.2d 863 (1995).  Plaintiffs' claim in this regard must fail because the evidence does not establish that there was a breach of any contract between plaintiffs and the corporate defendant.  Plaintiffs' claim is that the defendants, including the corporate defendant, were obligated to pay $300,000 at the consummation of the reverse merger transaction.  However, that payment was contingent upon receipt by the defendants, including the corporate defendant, of outside funding.  Outside funding, as has been shown, was the linchpin of the transaction.  Stated otherwise, the obligation to obtain outside funding, first by means of a private placement memorandum in the original Merger Agreement and subsequently by way of Tri-Corp Financial in the Closing Agreement, was a condition precedent to the defendants' obligation to make payment to the plaintiffs.  Since that condition was not fulfilled, plaintiffs were not entitled to their payment and the defendants did not breach the contract.

For these reasons, defendants are entitled to judgment on plaintiffs' claim for intentional interference with contract.

## Defendants' are Entitled to Judgment on Plaintiffs' Claim for Civil Conspiracy

The tort of civil conspiracy is a "malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages."  Williams v. Aetna Finance Company, 83 Ohio St. 3d 464, 475, 700 N.E.2d 859, 868 (1998), quoting Kenty v. Transamerica Premium Insurance Company, 72 Ohio St. 2d 415, 419, 650 N.E.2d 863, 866 (1995).  An underlying unlawful act is required before a civil conspiracy claim can succeed.  Gosden v. Louis, 116 Ohio App. 3d 195, 219, 687 N.E.2d 481, 496 (1996).  The "malice" involved in the tort is "that state of mind under which a person does a wrongful act purposely, without a reasonable or lawful excuse, to

the injury of another." <u>Pickel v. Swinehart</u>, 170 Ohio St. 441, 443, 166 N.E.2d 227, 229 (1960).

Plaintiffs cannot prevail on this claim because they have not established that the defendants committed any wrongful act. If the supposed "wrongful act" is the failure by the defendants to make a payment to the plaintiffs in the amount of $300,000, no such wrongful act occurred because the intention of the parties was that plaintiffs would not receive this payment unless outside funding were first obtained. If the so-called wrongful act was, as asserted at trial, the conduct of Terry Seipelt, plaintiffs' claim must also fail. The defendants, in signing the Closing Agreement, unquestionably obligated themselves to make the payment of $300,000 to the plaintiffs, <u>if</u> Tri-Corp paid the defendants $3 Million Dollars as it had committed to do. Nothing Seipelt said or did not say in a meeting with Lunan had any effect on the defendants' contractual obligations under the Closing Agreement (and the incorporated Merger Agreement). Stated otherwise, the defendants did not conspire among themselves to commit an unlawful act.

For these reasons, defendants are entitled to judgment on plaintiffs' civil conspiracy claim.

## DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

## Findings of Fact

1.    The plaintiffs, Larry Lunan and Susan Lunan, are citizens of Tennessee and were the principal shareholders of Bad Toys, Inc., which company was merged into defendant Mycom Group, Inc., pursuant to the plan and agreement of Merger between Bad Toys, Inc. and Myca Group, Inc., dated March 31, 2000 and the Closing Agreement dated August 23, 2000 (Joint Exhibits I and II, respectively).

2.      Defendants, Patricia A. Massey, G. Massey, George W. Young and Joan Carroll, were shareholders, officers and directors of Myca Group, Inc., prior to the merger.

3.      Defendant Seipelt is alleged to be an agent of the other individual defendants.

4.      Plaintiffs allege that as part of the merger, they were to receive $300,000 in return for certain consideration.

5.      Sometime in late 1999, Kenneth Hall approached the Myca Group shareholders and inquired as to whether they would be interested in taking their company public.  Initially, Hall stated that he was going to purchase Myca Group as a private investment and take it public.  However, in February 2000, Kenneth Hall's relationship with Myca Group, Inc. terminated because he was unable to produce the funds to take the company public.

6.      In late January or early February 2000, plaintiff, Larry Lunan, was introduced to the Myca shareholders by Lunan's attorney, Thomas Keenan.  Lunan was interested in a potential reverse merger.

7.      Larry Lunan's understanding of the merger was that it would result in a $300,000 payment to him and to his wife.  The payment would not be made to the Lunans unless and until outside funding was obtained by means of a private placement memorandum.  The parties' discussions in January and February 2000 led to the signing of the March 31, 2000 Merger Agreement (Joint Exhibit I).

8.      Although Lunan told the Myca shareholders that it would probably be easier to raise money after rather than before the merger transaction, the Myca shareholders were adamant that the deal would not be closed until the money was raised.  The reason for this was that the Myca shareholders were not sure they wanted to be a public company if the

money could not be raised since the whole purpose of being a public company was to be able to raise money to develop products.

9.    By August 2000, no money had yet been raised.  Lunan proposed that the company agree to substitute a note payable to him instead of cash in the amount of $300,000, but the Myca shareholders did not accept this proposal.

10.    On August 14, 2000, a Stock Purchase Agreement was entered into among Tri-Corp Financial, Inc., Bad Toys, Inc. (signed by Larry H. Lunan, President) and Mycom Group, Inc. (signed by Joan Carroll, President) (Joint Exhibit III).  Under the terms of this agreement, Tri-Corp agreed to pay $6 Million Dollars for newly issued shares of Bad Toys, Inc.  The payment was expressly made subject to the merger between Bad Toys, Inc. and Mycom Group, Inc., being effected.  Tri-Corp agreed to make the first payment of $3 Million Dollars within five days after receipt of stock of the merged entities.

11.    On August 23, 2000, Bad Toys, Inc. and Mycom Group, Inc., formerly known as Myca Group, Inc., entered into a Closing Agreement (Joint Exhibit II).  The Closing Agreement, Section 1, expressly modified certain provisions of the Merger Agreement.  The Closing Agreement provided that the last sentence of Section 7(c)(i) of the Merger Agreement would be deleted.  That section provided that, "in addition, as part of the consideration for the Merger, each Myca Group shareholder shall receive $200,000 or all of the Myca Group shareholders shall receive $800,000 in the aggregate."  The Closing Agreement also provided for the deletion of references to that cash amount in other sections of the Merger Agreement.

12.    The Closing Agreement, Section 1(j) provides that except for the modifications to the Merger Agreement expressly set forth in subsections 1(a) through 1(j)

of the Closing Agreement, "the provisions of the Merger Agreement are not affected by this

Closing Agreement and shall remain in full force and effect."

13.     Section 28 of the Merger Agreement, captioned "Entire Understanding,"

provides that:

> "The terms set forth in this Agreement including its Exhibits are intended by the parties as the final, complete and exclusive expression of the terms of their agreement and may not be contradicted, explained or supplemented by evidence of any prior agreement, any contemporaneous oral agreement or any consistent additional terms.   The Exhibits attached to this Agreement are made a part of this Agreement."

14.     Paragraph 5 of the Closing Agreement states as follows:

> "Bad Toys, Mycom Group and Tri-Corp Financial, Inc. ("Tri-Corp") entered into Stock Purchase Agreement No. 000-BDTY-TSP02 (the "Purchase Agreement") dated August 14, 2000 pursuant to which Tri-Corp shall purchase six million shares of Bad Toys common stock and shall make payment for the stock in two payments.   Upon the first payment of $3 Million Dollars as described in the purchase agreement, provided that Tri-Corp does not restrict the Bad Toys' use of funds in any way, (1) the Lunans shall receive payment of $300,000, of which $150,000 shall be paid to the Lunans and $150,000 of which shall be place in escrow pursuant to the Escrow agreement of even date herewith; and (ii) each shareholder of Mycom shall receive $200,000 or all of the shareholders of Mycom Group shall receive $800,000 in the aggregate."

15.     Tri-Corp never made the $3 Million Dollar payment referenced in Paragraph 5

of the Closing Agreement.

16.     The Merger Agreement and the Closing Agreement, Joint Exhibits I and II,

respectively, were intended by the parties as the final, complete and exclusive expression

of the terms of their agreement.

17.     The parties intended that the payment to the plaintiffs of the sum of $300,000

was contingent upon receipt by the defendants of $3 Million Dollars from Tri-Corp Financial,

which never materialized.  Since Tri-Corp Financial did not make payment to the defendants, defendants were not obligated to pay $300,000 to the plaintiffs.

18.    Larry Lunan's testimony that plaintiffs were to be paid $300,000 even if no outside funding was obtained is not credible.

**Conclusions of Law**

1.    The plaintiffs' breach of contract claim fails because plaintiffs have failed to prove by a preponderance of the evidence that defendants breached the terms of the Merger Agreement or the Closing Agreement.  It was the parties' intention that the Lunans would not be paid $300,000 until Tri-Corp paid $3 Million Dollars to the defendants, and this never occurred.  Defendants are, therefore, entitled to judgment on plaintiffs' claim for breach of contract.

2.    Plaintiffs have not established the elements of a claim for fraud.  Therefore, defendants are entitled to judgment on this claim.

3.    Plaintiffs have not established the elements of their claim for unjust enrichment and, therefore, defendants are entitled to judgment on this claim.

4.    Plaintiffs have not established the elements of their promissory estoppel claim because they have not established that a clear, unambiguous promise was made to them by the defendants concerning the payment of $300,000 that they would be paid regardless of whether outside funding was obtained.  Therefore, defendants, are entitled to judgment on this claim.

5.    Plaintiffs have not established their claim for intentional interference with contract because the evidence does not establish that there was a breach of any contract between plaintiffs and defendants.  Therefore, defendants are entitled to judgment on plaintiffs' claim for intentional interference with contract.

6.    Plaintiffs did not establish their claim for civil conspiracy because they have not established that the defendants committed any wrongful act.  Therefore, defendants are entitled to judgment on this claim.

7.    Judgment is entered in favor of all defendants, and plaintiffs' complaint is dismissed with prejudice.


 /s/ James M. Moore                    
James M. Moore            (#0009476)
Trial Attorney for Defendants, Mycom
  Group, Inc., Patricia A. Massey, G. Allan
  Massey, George W. Young, Joan Carroll
  and Terry Seipelt
312 Walnut Street, Suite 2300
Cincinnati, Ohio 45202-4091
(513) 421-6630  Telephone
(513) 421-0212  Facsimile

Of Counsel:

LINDHORST & DREIDAME
312 Walnut Street, Suite 2300
Cincinnati, Ohio 45202-4091
(513) 421-6630  Telephone
(513) 421-0212  Facsimile

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been sent by regular U.S. Mail to Matthew D. Davison, Esq. and Steven H. Trent, Esq., Attorneys for Plaintiffs, Baker, Donelson, Bearman, Caldwell, Berkowitz, PC, SunTrust Bank Building, Baker, 207 Mockingbird Lane, P. O. Box 3038, Johnson City, Tennessee 37602; and Stephen A. Watring, Esq., Dunlevey, Mahan & Furry, 110 North Main Street, Suite 1000, Dayton, OH 45402-1738, this 15th day of January, 2004.

 /s/ James M. Moore                    
James M. Moore
Attorney at Law

380271

- 21 -