IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION, AT CINCINNATI

LARRY LUNAN and                        )
SUSAN LUNAN,                           )
                                       )
     Plaintiffs,                      )
                                       )
v.                                     )        No. C-1-01-425
                                       )
MYCOM GROUP, INC., a Nevada Corporation )        JUDGE HERMAN J. WEBER
PATRICIA A. MASSEY, G. ALLAN MASSEY,   )
GEORGE W. YOUNG, JOAN CARROLL,         )
KENNETH R. HALL, and TERRY SEIPELT,    )
                                       )
     Defendants.                      )

**AMENDED AND RESTATED PROPOSED FINDINGS OF FACT**

     1.     The plaintiffs, Larry and Susan Lunan (the "Lunans"), are husband and wife and were the principal shareholders, officers and directors of Bad Toys, Inc. ("Bad Toys") (Transcript at 18-19), which company was merged into Myca Group, Inc. ("Myca") pursuant to the Plan and Agreement of Merger between Bad Toys and Myca dated March 31, 2000 (the "Merger Agreement") (Joint Exhibit No. I) and the Closing Agreement dated August 23, 2000 (the "Closing Agreement") (collectively referred to as the "Merger") (Joint Exhibit No. II).

     2.     Defendant Mycom Group, Inc. ("Mycom") is a Corporation existing under the laws of the State of Nevada which is authorized to do business in Ohio and is the surviving entity of the Merger.

     3.     Defendants Patricia A. Massey ("P. Massey"), G. Allan Massey ("A. Massey"), George W. Young ("Young"), and Joan Carroll ("Carroll") were the sole shareholders, officers, and directors of Myca prior to the Merger (Transcript at 156-157) and were the majority shareholders, officers and directors of Mycom subsequent to the Merger (Joint Exhibit No. I at Paragraph 6).

     4.     Defendant Terry Seipelt ("Seipelt") acted as an agent of Myca during negotiations between Bad Toys and its shareholders, officers, and directors and Myca and its shareholders, officers, and directors.

J M-D 55067 v2
0-0  01/15/2004

5.     The Lunans were introduced to Myca and its shareholders, officers and directors (P. Massey, A. Massey, Young, and Carroll) by their attorney, Thomas Keenan, in late January or early February 2000.  (Transcript at 36.)

6.     At the time, the Lunans were interested in a potential reverse merger wherein they would essentially sell the public company they had developed (Bad Toys) to a private company wishing to go public.  (Transcript at 36.)

7.     Discussions between the Lunans and Myca and its shareholders, officers and directors (P. Massey, A. Massey, Young, and Carroll) led to the signing of the Merger Agreement on March 31, 2000.  (Transcript at 56.)

8.     The Merger Agreement contemplated a private placement offering to be initiated "promptly after execution of" the Agreement and funded before closing of the Merger.  (Joint Exhibit I, paragraph 12(c).)

9.     Prior to executing the Merger Agreement, Larry Lunan counseled the Myca shareholders against initiating the private placement before the consummation of the Merger. (Transcript at 43-44.)

10.     In connection with the private placement offering, Paragraph 12(c) of the Merger Agreement provided:

> The net proceeds of the [private placement] offering shall be used by Bad Toys as follows:  (i) $800,000 shall be the cash portion of the consideration paid to the Myca Group shareholders in connection with the Merger as described [herein], (ii) $150,000 shall be paid to Bad Toys Sub to pay existing Bad Toys debt, (iii) $150,000 shall be paid to the Lunans (together with all the Bad Toys Sub outstanding common stock) to extinguish all remaining debts of Bad Toys owed to the Lunans, and (iv) 900,000 shall be retained by Bad Toys for product and service development . . . .

(Joint Exhibit No. I at Paragraph 12(c).)

11.     Prior to executing the Merger Agreement, Mr. Lunan counseled the Myca shareholders that the private placement construct proposed by the Myca shareholders was unlikely to succeed, as it provided that only approximately one-half of the total proceeds of the proposed private placement would be used to fund the business of Mycom while the other one half of the proceeds would go into the pockets of the Myca shareholders.  (Transcript at 43.)

12.     Mr. Lunan testified as follows:  "I told [the Myca shareholders] I thought that it would be very difficult to do.  I thought that no investor wants to put money in their bank

account.  [Investors] have no problem putting money in their business account, but putting it in the individual accounts would be difficult."  (Transcript at 44-45.)

13.     Based on his twelve years of experience as a financial professional (Transcript at 30), Mr. Lunan knew that while investors may have been interested in funding Mycom's business and product development efforts, no investor would desire to give his or her money to the Myca shareholders to be used for their personal benefit (Transcript at 44).

14.     Mr. Lunan's communicated skepticism regarding the likelihood of the success of the private placement demonstrates that he would not have agreed to make the consideration he was to receive for Bad Toys (the $150,000 payment to Bad Toys Sub and the $150,000 payment to he and his wife) contingent on the success of such plan.

15.     However, the Lunans agreed to proceed and execute the Merger Agreement based on the understanding that even if the Myca shareholders were unable to raise money through the private placement, that the payment of the $300,000 would still be made to the Lunans at closing, even if made in the form of a promissory note.  (Transcript at 46.)

16.     P. Massey, who was the lead Myca shareholder participating in negotiations with the Lunans and Bad Toys, understood when the Merger Agreement was executed that the Lunans would receive $300,000 as compensation for the Merger.

17.     Between March 31, 2000 and August 23, 2000, P. Massey spent a limited amount of time trying to arrange for funding of the private placement offering contemplated in the Merger Agreement.

18.     P. Massey spent four or five days total in the field working to obtain funding of the private placement offering.  (Transcript at 179.)

19.     During this time, Mr. Lunan, although not an officer, director, or shareholder of Myca and although unfamiliar with the Mycom business, was also working to obtain funding, and he encouraged P. Massey to contact some of his potential sources of funding.  (Transcript at 85-88.)

20.     Mr. Lunan offered to remain involved in the efforts to obtain funding for the private placement offering, but, as Mr. Lunan testified, "Bad Toys doesn't know their product line.  Bad Toys doesn't know their sales potential.  Bad Toys doesn't know their employees . . . the individuals investing [in Mycom] don't want to deal with Bad Toys."  (Transcript, p. 52.)

21.     Additionally, P. Massey refused to permit Mr. Lunan to be involved in the private placement because she understood that it would be better for potential investors to hear just the Mycom story.  (Transcript at 89.)

3

22.    Both P. Massey and Young testified that the reason Myca and the Myca shareholders were interested in transactions like the Merger was to provide a capital infusion to the business of Mycom.  (Transcript at 163, 206.)

23.    However, Myca developed and pursued a private placement funding strategy as embodied in the Merger Agreement and Closing Agreement that focused more on personally enriching the Myca shareholders than providing a capital infusion to Mycom, as approximately one-half of the private placement proceeds that were to be raised through the proposed plan were to flow to the Myca shareholders for their personal use.  (Joint Exhibit No. I at Paragraph 12(c).)

24.    During the March-to-August timeframe, P. Massey repeatedly encouraged the Lunans to pay the Bad Toys debt in anticipation of the Merger.  (Transcript at 182.)

25.    P. Massey also enlisted Ken Hall, who acted as an Agent of Myca and its shareholders, directors and officers, to communicate with Mr. Lunan about paying outstanding debts of Bad Toys.  (Transcript at 183.)

26.    Seipelt, who was hired as acting CFO by the Myca shareholders in early August 2000, also communicated with Mr. Lunan about ensuring the Bad Toys debts were paid before the closing of the Merger.  (Transcript at 69.)

27.    Mr. Lunan testified that he was under "enormous pressure" by the Myca shareholders to pay the debts of Bad Toys.  (Transcript at 68.)

28.    Once Seipelt was hired in August 2000, he reviewed the Merger Agreement and advised P. Massey and the other Myca shareholders, directors and officers that they were paying too much for the Merger with Bad Toys.  (Transcript at 247.)

29.    Seipelt advised P. Massey that Myca should not go forward with the Merger as proposed in the Merger Agreement previously executed.  (Transcript at 193.)

30.    At a meeting held between P. Massey, Carroll, Mr. Lunan, and Seipelt, Seipelt expressed his concerns about the payment the Lunans were to receive for the merger, and Mr. Lunan was adamant, to the point of leaving the room and slamming the door, that unless he received $300,000, he was not going to sell the shell.  (Transcript at 84, 248-249.)

31.    At about the time of the meeting among Mr. Lunan, Seipelt, P. Massey, and Carroll, the parties were discussing the possibility of Myca providing to the Lunans a note in the amount of $300,000 as a substitute for the contemplated net $300,000 payment the Lunans were entitled to under the terms of the Merger Agreement.  (Transcript at 77-78.)

32.     These discussions progressed so far as the drafting of a Closing Agreement and other closing documents that included a provision for a note and the drafting of a proposed note. (Transcript at 79.)

33.     Within days after the meeting at which Mr. Lunan expressed his absolute unwillingness to sell the Bad Toys shell absent payment of $300,000 and the negotiations regarding the proposed note, P. Massey called Mr. Lunan to inform him that they would be receiving funds in the amount of $3 million from Tricorp Financial, Inc. ("Tricorp") pursuant to the private placement offering, and that as a consequence of receiving this money, the Lunans would be paid immediately, alleviating the need for a note.  (Transcript at 89.)

34.     Prior to accepting Tricorp's proposal, P. Massey was presented with a proposal from Sovereign Capital that would have provided more money to the Company and less to the Myca shareholders; however, the Myca shareholders elected to forego such transaction and pursue the more personally lucrative Tricorp deal.  (Transcript at 202, 255-257.)

35.     Bad Toys and Mycom entered into a Stock Purchase Agreement with Tricorp on August 14, 2000 by which Tricorp would purchase six million shares of stock in the surviving entity for a total payment of $6 million.  (Transcript at 91; Joint Exhibit No. III.)

36.     P. Massey instructed Mr. Lunan to issue six million shares of Bad Toys stock to Tricorp pursuant to the Stock Purchase Agreement entered into with Tricorp dated August 14, 2000.  (Transcript at 194.)

37.     Very little due diligence was conducted to investigate the legitimacy of the Tricorp commitment to purchase six million shares of stock for $6 million.  (Transcript at 94, 266.)

38.     P. Massey testified that her diligence efforts consisted of making two phone calls, one to Tom Keenan, the attorney for Bad Toys, and another to Neil Ganulin, the attorney for Myca.  (Transcript at 194.)

39.     P. Massey testified that Neil Ganulin "checked [Tricorp] out" and told her that "it looked good."  (Transcript at 194.)

40.     However, Mr. Ganulin testified that he did no diligence on Tricorp (Transcript at 266), indicating that P. Massey lied about her conversation with Mr. Ganulin to hide the fact that almost no diligence was conducted regarding Tricorp or its commitment to purchase shares of Mycom stock.

41.     After the Tricorp funding was "promised" to Myca and its shareholders, officers and directors of Myca sought to close the Merger and promised Mr. Lunan that the funding from Tricorp would be in-hand within three days after the closing.  (Transcript at 89-90.)

J M-D 55067 v2
0-0  01/15/2004

42.    Once the parties decided to close the Merger, notwithstanding that the private placement offering had not been consummated, the text from paragraph 12(c) of the Merger Agreement was deleted and the following language was substituted in paragraph 5 of the Closing Agreement:

> . . . . Upon the first payment of $3,000,000, as described in the Purchase Agreement, provided that Tricorp does not restrict the Bad Toys' use of funds in any way, (i) the Lunans shall receive payment of $300,000, of which $150,000 shall be paid to the Lunans and $150,000 of which shall be placed in escrow pursuant to the Escrow Agreement of even date herewith; and (ii) each shareholder of Mycom Group shall receive $200,000 or all of the shareholders of Mycom Group shall receive $800,000 in the aggregate.

(Joint Exhibit No. II, Paragraph 5.)

43.    The Closing Agreement between Bad Toys and Myca Group, Inc. was executed on August 23, 2000.  (Joint Exhibit No. II.)

44.    The Closing Agreement does not contain any provision incorporating the Merger Agreement into the Closing Agreement, nor does it contain an integration clause providing that the Agreement represents the full and final understanding of the parties and that no other oral or written agreements exist.  (Joint Exhibit No. II.)

45.    The Closing Agreement does not specifically state that payment of $300,000 for the benefit of the Lunans is contingent upon receipt of funding by Tricorp.  (Joint Exhibit No. II.)

46.    P. Massey believed that, pursuant to the terms of the Closing Agreement as executed, if funding from a source other than Tricorp was obtained after the closing, the Lunans would still be paid $300,000.  (Transcript at 197.)

47.    Seipelt believed that, pursuant to the terms of the Closing Agreement as executed, if funding from a source other than Tricorp was obtained after the closing, the Lunans would still be paid $300,000.  (Transcript at 259.)

48.    Tricorp defaulted under the terms of the Stock Purchase Agreement dated August 14, 2000.  (Transcript at 106.)

49.    Neither Myca, nor its shareholders, officers, or directors sought to enforce the Stock Purchase Agreement with Tricorp.  (Transcript at 195.)

J M-D 55067 v2
0-0  01/15/2004

50.    Both before and after the Closing Agreement was executed, P. Massey, Seipelt, and Ken Hall repeatedly pressed Mr. Lunan to pay the debts of Bad Toys with the $300,000 payment used as an inducement.  (Transcript at 97-98,182-183.)

51.    Based on representations made by the individual defendants herein, both prior to and after the closing of the Merger, indicating that payment of $300,000 to the Lunans was forthcoming, the Lunans performed their obligations under the Merger Agreement and the Closing Agreement, including paying the pre-merger debt of Bad Toys.  (Transcript at 97-98, 123-128, 182-183.)

52.    In October 2000, Mycom was required to submit audited financial statements to the United States Securities and Exchange Commission (the "SEC") as part of a periodic report required of public companies.  (Transcript at 106-107, 258.)

53.    In anticipation of this filing, P. Massey and Seipelt contacted Mr. Lunan expressing concerns that the payment owing to the Lunans negatively impacted the presentation of Mycom's financial status, and therefore, requested that the Lunans consent to the conversion of Mycom's $300,000 obligation from a due and owing obligation to a contingent obligation. (Transcript at 107.)

54.    However, the Lunans refused to consent to such conversion and provided Mycom with examples of the appropriate presentation in Mycom's financial statements showing the $300,000 payment as a due and owing obligation.  (Transcript at 107-109; Plaintiffs' Exhibit No. 46.)

55.    The fact that P. Massey and Seipelt sought the consent of the Lunans to change the characterization of the $300,000 payment from one that was due and owing to one that was contingent demonstrates that the obligation was regarded by both parties as due and owing without contingency.

56.    Mycom submitted the audited financial statements to the SEC without any reference to a payment owing to the Lunans.  (Transcript at 258.)

57.    According to the testimony of Seipelt, Mycom decided not to report this liability in part on the basis of an opinion letter rendered by Neil Ganulin, Myca's attorney.  (Transcript at 250.)

58.    However, Mr. Ganulin's opinion letter does not definitively state that Mycom owes no payment to the Lunans, but instead merely provides that it was reasonable for Mycom to take the position that it does not have an obligation to pay Mr. Lunan.  (Transcript at 251.)

59.    Additionally, Mr. Ganulin's opinion letter explicitly states that the conclusions expressed therein were premised on the assumption that the parole or oral evidence regarding

7

negotiations of the Closing Agreement would support Mycom's contention that it did not agree to pay Mr. Lunan $300,000 within one year of closing.  (Transcript at 252.)

60.     Seipelt, as acting CFO of Mycom, coordinated the audit process and corresponded with Mycom's independent auditors regarding whether Mycom's financial statements should reflect an obligation to the Lunans.  (Defendants' Exhibit No. 501; Transcript at 233.)

61.     However, despite his title and position with Mycom, at trial Seipelt refused to accept responsibility for the filing of these financial statements that omitted the payment owing to the Lunans.  (Transcript at 258-259.)

62.     As Seipelt testified, he understood the Closing Agreement to require payment to the Lunans if Tricorp or a funding source other than Tricorp funded Mycom.  (Transcript at 259.)

63.     The fact that Ganulin in his opinion letter recognizes that oral evidence will have a bearing on the conclusion as to the status of the payment to the Lunans demonstrates that the Closing Agreement is ambiguous.

64.     The Myca shareholders never shared Ganulin's opinion letter with the Lunans.  (Transcript at 267.)

65.     In fact, while in receipt of Ganulin's opinion letter and after signing off on the financial statements that omitted to record a payment owing to the Lunans, P. Massey and K. Hall continued to press the Lunans to pay the debts of Bad Toys (now Mycom) using the $300,000 as an inducement, while at the same time knowing that Mycom had taken the position in its SEC filing that it owed no obligations to the Lunans.  (Transcript at 106-107.)

66.     When Tricorp defaulted on the Stock Purchase Agreement, the Myca shareholders looked for funding of a sort that would benefit them personally, but would provide no payment to the Lunans.

67.     Beginning in mid-to-late September 2000, Mycom began negotiations with Bobbitt & Bransom, Inc. d/b/a Broughton International, resulting in a merger of the two companies in April 2001.  (Transcript at 196.)

68.     As part of this merger, the four original Myca shareholders sold a combined total of Twenty-Seven Million (27,000,000) shares of their personal Mycom stock to Broughton Acquisition, LLC, for the aggregate consideration of $1,108,669 paid to the Myca shareholders as follows:  $272,167.58 to P. Massey, $217,734.06 to A. Massey, $293,940.98 to Carroll, and $324,827.68 to Young.  (Transcript at 199-200.)

69.     The Lunans did not participate in or receive any payments as a result of the transaction between the Myca shareholders and Broughton & Bransom.  (Transcript at 110.)

8

70.     The difference between the total consideration received by the Myca shareholders in the transaction with Broughton & Bransom, Inc. and the total consideration the Myca shareholders would have received pursuant to the Merger Agreement and Closing Agreement with Bad Toys is approximately $300,000, the amount of the payment owed to the Lunans. (Transcript at 202.)

71.     Mr. Bransom, a principal in Bobbitt & Bransom and Broughton Acquisition, was never informed by Mycom or its shareholders, officers or directors that they considered that the Lunans were still owed $300,000 if Mycom obtained substantial funding.  (Transcript at 197-198.)

72.     P. Massey and Ken Hall, acting on behalf of Mycom and its shareholders, officers and directors, promised Mr. Lunan that the Bobbitt & Bransom merger would yield payment to the Lunans of $300,000.  (Transcript at 106, 109-110.)

73.     These promises were made in conjunction with requests for Mr. Lunan to complete payment of Bad Toys' pre-merger debts.  (Transcript at 106-107.)

74.     In reliance upon the numerous representations made by the defendants, the Lunans have incurred to their detriment great expense in the forgiveness and pay-off of Bad Toys debt, the costs of the merger transaction, and restrictions on the transfer of Mycom shares held by the Lunans.

75.     In an effort to facilitate the closing of the Merger, the Lunans paid other obligations of Mycom at the request of the defendants, including but not limited to SEC registration fees and audit fees, in reliance upon representations made by the defendants that the Lunans would be paid $300,000.  (Transcript at 66-67.)

76.     The pre-Merger debt of Bad Toys and the expenses of Mycom paid by the Lunans together equaled approximately $300,000.  (Transcript at 49.)

77.     The Lunans would never have agreed to pay Bad Toys pre-merger debt or other obligations of the surviving entity, Mycom, if Mr. Lunan had not repeatedly been promised payment of $300,000.  (Transcript at 98.)

78.     Pursuant to the Merger Agreement, the Lunans formed a new corporation (" BTMC") that assumed the debt and obligations of Bad Toys and received the pre-merger assets of Bad Toys.  (Transcript at 19, 49.)

79.     In connection with the Merger, the Lunans forgave approximately $984,000 of debt owed to them by Bad Toys.  (Transcript at 49.)

J M-D 55067 v2
0-0  01/15/2004

80.    Following the consummation of the Merger, the Lunans worked for over two years and incurred great expense making BTMC a publicly-traded company. (Transcript at 28-29, 136.)

81.    Ken Hall, acting on behalf of the Myca shareholders, officers and directors, induced the Lunans to agree to return 500,000 shares of stock and enter into a lockdown and dribble agreement restricting the future sale of shares by the Lunans based on the representation that the Lunans would be paid $300,000. (Transcript at 103-104.)

82.    The restrictions imposed by the lockdown and dribble agreement prevented the Lunans from selling any of their shares in Mycom prior to November 2001 (Plaintiff's Exhibit No. 2 at Paragraph 2), and because the Lunans would have sold their stock in Mycom prior to this date but for such restrictions, the lockdown and dribble agreement cost the Lunans between $500,000 and $1,500,000 (Transcript at 104-105).

83.    Additionally, the Lunans expended years of effort and incurred great expense to make Bad Toys a public company and an attractive merger candidate for Myca. (Transcript at 28, 48.)

84.    Financial Statements prepared for the closing demonstrate that Bad Toys had well over a million dollars of equity, not counting the Tricorp proposed funding.

85.    The Lunans have never received any consideration for the debt-free public company they built.

86.    Instead, as a result of the Merger, the Lunans went from holding the majority of the outstanding freely-tradable shares in a publicly-traded corporation to becoming minority shareholders holding restricted shares in a publicly-traded corporation.

87.    In contrast, Mycom and its shareholders, officers and directors have accepted substantial benefits resulting from the Merger.

10

### AMENDED AND RESTATED PROPOSED CONCLUSIONS OF LAW

**I.:  Breach of Contract**

1.     When two parties have made a contract and have expressed it in a writing to which they have both assented *as the complete and accurate integration of that contract,* evidence, whether parole or otherwise, of antecedent understandings and negotiations will be not admitted for the purpose of varying or contradicting the writing.  National City Bank, Akron v. Donaldson, 642 N.E.2d 58 (Ohio Ct. App. 1970).

2.     The threshold question in determining whether to consider parole evidence to determine the intent of the parties is whether the written agreement is the complete and unambiguous understanding of the parties.  National City Bank, Akron v. Donaldson, 642 N.E.2d 58 (Ohio Ct. App. 1970).

3.     The Closing Agreement is ambiguous in its attempt to address the payment of $300,000 for the benefit of the Lunans as consideration in the Merger and does not represent the complete and unambiguous understanding of the parties.  (Order Denying Summary Judgment.)

4.     Evidence of the parties' conduct and admitted understandings after execution of the Closing Agreement is admissible to show modification of the prior written agreement.  See Gerwin v. Clark, 363 N.E.2d 602 (Ohio Ct. App. 1977).

5.     A valid agreement existed between Plaintiffs and Defendant Mycom based on oral and written representations wherein Plaintiffs were to receive $300,000 as part of the Merger.

6.     Defendant Mycom breached its agreement with the Lunans when it abandoned this agreement and refused to pay the Lunans as represented.

7.     Defendant Mycom is liable to the Lunans for its breach.

8.     As a direct result of Mycom's breach, the Lunans have suffered compensatory damages in an amount exceeding $300,000.

**II.:  Fraud**

9.     To establish a claim of fraud a plaintiff must show (a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and

J M-D 55067 v2
0-0  01/15/2004

(f) a resulting injury proximately caused by the reliance.  <u>Russ v. TRW</u>, 570 N.E.2d 1076, 1083 (Ohio 1991).

10.    The individual defendants herein each intentionally and maliciously made false representations to Mr. Lunan regarding payment of $300,000 to the Lunans in consideration for the Merger.

11.    Specifically, Mr. Lunan was told by these individual defendants, subsequent to the closing of the transaction, that the Lunans would be paid $300,000 as agreed if the Lunans extinguished the debt owed by Mycom to the Lunans and others after the merger transaction.

12.    The above false representations were made even though the defendants knew that Mycom would not pay the Lunans $300,000 as agreed.

13.    The above false representations were made with the intent to induce the Lunans to incur substantial expense in extinguishing substantial debt owed by the Defendant Mycom to the Lunans and others.

14.    The Lunans reasonably relied upon the above false representations to their detriment by extinguishing substantial debt owed by the Defendant Mycom to the Lunans and others.

15.    The Lunans have suffered significant monetary damage as a result of their reasonable reliance upon the defendants' false representations.

### III.:  Unjust Enrichment

16.    Unjust enrichment is a concept within contract law that operates to prevent an injustice when one party retains the benefit of another party's efforts without paying fair compensation.  If an express contract exists concerning the services for which compensation is sought, the doctrine of unjust enrichment does not apply in the absence of fraud, bad faith, or illegality.  Absent at least one of these elements, imposition of hardship upon one party or advantage to the other does not relieve the parties from their agreement.  <u>Howland v. Lyons</u>, 2002 WL 3636299, No. 77870 at *3 (Ohio Ct. App. Mar. 7, 2002) (citations to reported cases omitted).

17.    The defendants' acceptance of the substantial benefits resulting from the Merger, despite their refusal to pay the Lunans as agreed, has resulted in an unjust enrichment to the defendants.

18.    The defendants received control of a debt-free publicly-traded company and have paid no consideration for its shares.

J M-D 55067 v2
0-0  01/15/2004

19.    The Lunans no longer have control over the public company they built and are in the undesirable position of being minority shareholders with shares that are not freely-transferable due to transfer restrictions imposed thereon as a result of the Merger.

20.    The defendants received and accepted a substantial benefit from the Lunans when the Lunans extinguished substantial debt owed by the Defendant Mycom to the Lunans and others before and after the Merger.  Defendants have recognized the benefit conferred upon them by the Lunans by representing that the Lunans would be paid $300,000 for the same.

21.    The defendants' acceptance of the aforementioned benefits was made under such circumstances that it would be inequitable for Defendants to retain said benefits without payment of the value thereof.

22.    The defendants' acted fraudulently, or at least in bad faith, when they attempted to change the terms of the Merger in the last weeks before closing and inserted an attempted limited payment option involving the anticipated Tricorp funding and when no enforcement was sought against Tricorp upon its default but, instead, Mycom entered into a merger with Bobbitt & Bransom wherein P. Massey, A. Massey, Carroll, and Young each personally prospered from the sale of their Mycom shares.

23.    The defendants are liable to the Lunans for the value of the benefits each received from the Lunans and accepted without payment, thereby resulting in an unjust enrichment to the defendants.

### IV.:  Promissory Estoppel

24.    A claim of promissory estoppel involves three elements: (1) a clear, unambiguous promise; (2) reasonable and foreseeable reliance upon the promise by the person to whom the promise is made; and (3) resulting injury to the party who relied on the promise.  McCroskey v. State, 456 N.E.2d 1204 (Ohio 1983).

25.    The defendants' promises to the Lunans that Mycom would pay the Lunans $300,000 as agreed were such that the defendants should have known that said promises would induce the Lunans to take action in reliance upon the same.

26.    The Lunans did reasonably act in reliance upon said promises to their detriment by extinguishing substantial debt owed by Mycom to the Lunans and others, by consenting to the imposition of restrictions on their ability to trade their shares of Mycom stock, and by giving up control of the publicly-traded company they had built.

27.    As a direct result of the Lunans' detrimental reliance upon the promises of the defendants, the Lunans suffered substantial economic loss, including the amounts paid to

extinguish debt owed by Mycom, the costs associated with their inability to sell their Mycom stock until November 2001 and other costs associated with the Merger.

28.    Enforcement of the promises made by the defendants is necessary to avoid substantial injustice.  Therefore, the defendants are liable to the Lunans for the loss the Lunans suffered in reasonable reliance upon said promises based on *promissory estoppel*.

### V.:  Civil Conspiracy

29.    The tort of civil conspiracy is a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages.  Williams v. Aetna Fin. Co., 700 N.E.2d 859 (Ohio 1998)

30.    Each of the individual defendants engaged in a malicious combination to injure the Lunans by conspiring to fraudulently induce the Lunans to extinguish debt on behalf of Mycom and by conspiring to intentionally procure the breach of the contract between the Lunans and Mycom.

31.    The Lunans have suffered substantial economic loss as a result of the defendants' conspiracy to commit fraud and conspiracy to intentionally interfere with a contract.

### VI.  Damages

32.    As a result of the Defendants' actions, the Lunans are entitled to damages totaling $2,899,574.10, which includes the following: (i) $300,000 as compensation for the payments called for by the Merger Agreement and the Closing Agreement; (ii) $984,000 as compensation for the debt the Lunans forgave that was owed to them by Bad Toys; (iii) $1,000,000 to compensate the Lunans for the losses they incurred as a consequence of the lock down and dribble agreement's restrictions prohibiting the Lunans from selling their Mycom stock prior to November 2001; (iv) $500,000 in punitive damages; (v) $100,469.50 in attorney fees incurred through January 12, 2004 ; and (vi) $15,104.64 in costs and expenses incurred through January 12, 2004.

J M-D 55067 v2
0-0  01/15/2004

Respectfully Submitted,


  /s/ Steven H. Trent_____
Steven H. Trent, Esq. (TN BPR No. 016322)
Matthew D. Davison, Esq. (TN BPR No.020049)
Baker, Donelson, Bearman, Caldwell & Berkowitz
207 Mockingbird Lane
P.O. Box 3038
Johnson City, Tennessee 37602
(423) 928-0181
Fax:  (423) 928-5694
E-mail:  strent@bakerdonelson.com

Attorneys for Plaintiffs
Larry Lunan and Susan Lunan

Certificate of Service

I hereby certify that on January 15, 2004, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Stephen A. Watring
Dunlevey, Mahan & Furry
110 North Main Street, Suite 1000
Dayton, Ohio 45202-1738

James M. Moore
Lindhorst & Dreidame
312 Walnut Street, Suite 2300
Cincinnati, Ohio 45202-4091

 _/s/ Steven H. Trent_____
Steven H. Trent, Esq. (TN BPR No. 016322)
Matthew D. Davison, Esq. (TN BPR No.020049)
Baker, Donelson, Bearman, Caldwell & Berkowitz
207 Mockingbird Lane
P.O. Box 3038
Johnson City, Tennessee 37602
(423) 928-0181
Fax: (423) 928-5694
E-mail: strent@bakerdonelson.com

Attorneys for Plaintiffs
Larry Lunan and Susan Lunan

16