IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION, AT CINCINNATI

LARRY LUNAN and            )
SUSAN LUNAN,               )
                           )
     Plaintiffs,          )
                           )
v.                         )        No. C-1-01-425
                           )
MYCOM GROUP, INC., a Nevada Corporation    )        JUDGE HERMAN J. WEBER
PATRICIA A. MASSEY, G. ALLAN MASSEY,       )
GEORGE W. YOUNG, JOAN CARROLL,             )
KENNETH R. HALL, and TERRY SEIPELT,        )
                           )
     Defendants.          )

**POST TRIAL BRIEF**

Come now the Plaintiffs, Larry Lunan and Susan Lunan (the "Lunans"), by and through

counsel, and pursuant to this Court's Order entered September 20, 2004, offer this Post-Trial

Brief in support of their claims in this matter.

## I.  STATEMENT OF FACTS

The Lunans are husband and wife and were the principal shareholders, officers and

directors of Bad Toys, Inc. ("Bad Toys"), a publicly traded motorcycle company headquartered

in Kingsport, Tennessee.  (Transcript at 18-19.)  Defendant Mycom Group, Inc. ("Mycom") is a

Corporation existing under the laws of the State of Nevada which is authorized to do business in

Ohio and is the surviving entity of the eventual merger between Bad Toys and Myca Group, Inc.

("Myca"), a privately held technology company headquarted in Cincinnati, Ohio (the "Merger").

(Joint Exhibit No. I.)  Defendants Patricia A. Massey ("P. Massey"), G. Allan Massey ("A.

1

Massey"), George W. Young ("Young"), and Joan Carroll ("Carroll") were the sole shareholders, officers, and directors of Myca prior to the Merger (Transcript at 156-157) and were the majority shareholders, officers and directors of Mycom subsequent to the Merger (Joint Exhibit No. I at Paragraph 6).

The Lunans were introduced to Myca and its shareholders, officers and directors (P. Massey, A. Massey, Young, and Carroll) by the Lunans' attorney, Thomas Keenan, in late January or early February 2000. (Transcript at 36.) At the time, the Lunans were interested in a potential reverse merger wherein they would essentially sell the public company they had developed (Bad Toys) to a private company wishing to go public. (Transcript at 36.) The Lunans had expended years of effort and incurred great expense to that point making Bad Toys a publicly traded company and an attractive merger candidate. (Transcript at 28, 48.) Discussions between the Lunans and Myca and its shareholders, officers and directors (P. Massey, A. Massey, Young, and Carroll) led to the signing of the Plan and Agreement of Merger between Bad Toys and Myca dated March 31, 2000 (the "Merger Agreement") (Joint Exhibit No. I). The transaction contemplated by the Merger Agreement was eventually consummated pursuant to the Closing Agreement dated August 23, 2000 (the "Closing Agreement") (Joint Exhibit No. II).

The Merger Agreement contemplated a private placement offering to be initiated promptly after execution of the Merger Agreement and funded before closing of the Merger. (Joint Exhibit I, paragraph 12(c).) Although both P. Massey and Young testified that the reason Myca and the Myca shareholders were interested in transactions like the Merger was to provide a capital infusion to the business of Mycom (Transcript at 163, 206), the Myca shareholders developed and insisted upon a private placement funding strategy that focused more on

personally enriching the Myca shareholders than providing a capital infusion to Mycom, with approximately one-half of the private placement proceeds that were to be raised through the proposed plan going to the Myca shareholders for their personal use. (Joint Exhibit No. I at Paragraph 12(c).) Specifically, the private placement offering contemplated at Paragraph 12(c) of the Merger Agreement provided:

> The net proceeds of the [private placement] offering shall be used by Bad Toys as follows: (i) $800,000 shall be the cash portion of the consideration paid to the Myca Group shareholders in connection with the Merger as described [herein], (ii) $150,000 shall be paid to Bad Toys Sub to pay existing Bad Toys debt, (iii) $150,000 shall be paid to the Lunans (together with all the Bad Toys Sub outstanding common stock) to extinguish all remaining debts of Bad Toys owed to the Lunans, and (iv) 900,000 shall be retained by Bad Toys for product and service development . . . .

(Joint Exhibit No. I at Paragraph 12(c).)

Prior to executing the Merger Agreement, Larry Lunan counseled the Myca shareholders against initiating a private placement before the consummation of the Merger. (Transcript at 43-44.) Specifically, Mr. Lunan told the Myca shareholders that the private placement construct proposed by the Myca shareholders was unlikely to succeed, as it provided that only approximately one-half of the total proceeds of the proposed private placement would be used to fund the business of Mycom while the other one-half of the proceeds would go into the pockets of the Myca shareholders. (Transcript at 43.) Based on his twelve years of experience as a financial professional (Transcript at 30), Mr. Lunan knew that while investors may have been interested in funding Mycom's business and product development efforts, no investor would desire to give his or her money to the Myca shareholders to be used for their personal benefit (Transcript at 44). Mr. Lunan testified at trial that he told the Myca shareholders that the private

placement as proposed by the Myca shareholders "would be very difficult to do." (Transcript at 44-45.) Mr. Lunan went on to tell the Myca shareholders that "no investor wants to put money in their bank account. [Investors] have no problem putting money in their business account, but putting it in the individual accounts would be difficult." (Transcript at 44-45.)

The Lunans, however, agreed to proceed and execute the Merger Agreement based on the understanding that *even if the Myca shareholders were unable to raise money through the private placement*, the total payment of $300,000 would still be made to the Lunans at closing, even if made in the form of a promissory note. (Transcript at 45-46.)

Between March 31, 2000 and August 23, 2000, P. Massey spent a very limited amount of time trying to arrange for funding of the private placement offering contemplated in the Merger Agreement. In fact, Ms. Massey spent only four or five days total in the field working to obtain outside funding. (Transcript at 179.) Mr. Lunan offered to be involved in Myca's efforts to obtain funding for the private placement offering, but, as Mr. Lunan testified, "Bad Toys [didn't] know [Myca's] product line. Bad Toys [didn't] know [Myca's] sales potential. Bad Toys [didn't] know [Myca's] employees . . . the individuals investing [in Myca] don't want to deal with Bad Toys." (Transcript at 52.) In any event, P. Massey refused to permit Mr. Lunan to be formally involved in the private placement because she believed that it would be better for potential investors to hear just the Mycom story. (Transcript at 89.)

During the March-to-August timeframe, P. Massey also repeatedly encouraged the Lunans to pay Bad Toys debt in anticipation of the Merger. (Transcript at 182.) Ms. Massey enlisted the help of Ken Hall, who acted as an Agent of Myca and its shareholders, directors and officers, to communicate with Mr. Lunan about paying outstanding debts of Bad Toys.

4

(Transcript at 183.)  Terry Seipelt ("Seipelt"), who was hired as Myca's acting Chief Financial Officer in early August 2000, also communicated with Mr. Lunan about ensuring the Bad Toys debts were paid before the closing of the Merger.  (Transcript at 69.)  Mr. Lunan testified that he was under "enormous pressure" by the Myca shareholders to pay the debts of Bad Toys. (Transcript at 68.)

Once Seipelt was hired in August 2000, he reviewed the Merger Agreement and advised P. Massey and the other Myca shareholders, directors and officers that they were paying too much for the Merger with Bad Toys.  (Transcript at 247.)   Additionally, Seipelt advised P. Massey that Myca should not go forward with the Merger as proposed in the Merger Agreement previously executed.  (Transcript at 193.)  At a meeting held between P. Massey, Carroll, Mr. Lunan, and Seipelt, Seipelt expressed his concerns about the payment the Lunans were to receive for the merger.  In response to the concerns expressed by Seipelt, Seipelt testified that Mr. Lunan was adamant, to the point of leaving the room and slamming the door, that unless he received $300,000, he was not going to go through with the merger.  (Transcript at 248-249.)

At about the same time of this meeting between Mr. Lunan, Seipelt, P. Massey, and Carroll, the parties were formally discussing Myca providing to the Lunans a note in the amount of $300,000 as a substitute for the contemplated net $300,000 payment the Lunans were entitled to receive under the terms of the Merger Agreement.  (Transcript at 77-78.)  These discussions progressed so far as the drafting of a Closing Agreement and other closing documents that included a provision for a note, as well as the drafting of a proposed note.  (Transcript at 79.) However, within days after the meeting at which Mr. Lunan expressed his absolute unwillingness to go through with the Merger absent payment of $300,000 and the negotiations

regarding the proposed note, P. Massey called Mr. Lunan to inform him that she would be receiving funds in the amount of $3 million from Tricorp Financial, Inc. ("Tricorp") pursuant to the private placement offering, and that as a consequence of receiving this money, the Lunans would be paid immediately, alleviating the need for a note. (Transcript at 89.) After the Tricorp funding was "promised," Myca and its shareholders, officers and directors sought to close the Merger and promised Mr. Lunan that the funding from Tricorp would be in-hand within three days after the closing. (Transcript at 89-90.)

Unfortunately for the Lunans, Myca conducted virtually no due diligence to investigate the legitimacy of Tricorp's commitment to purchase six million shares of stock for $6 million before accepting the Tricorp deal. (Transcript at 94, 266.) P. Massey testified that her only diligence efforts consisted of making two phone calls, one to Tom Keenan, the attorney for Bad Toys, and another to Neil Ganulin, the attorney for Myca. (Transcript at 194.) Notably, Ms. Massey testified that Neil Ganulin "checked [Tricorp] out" and told her that "it looked good." (Transcript at 194.) However, Mr. Ganulin testified that he did no diligence on Tricorp (Transcript at 266), clearly indicating that P. Massey lied about her conversation with Mr. Ganulin to hide the fact that almost no diligence was conducted regarding Tricorp or its commitment to purchase shares of Mycom stock.

Nonetheless, the Defendants entered into a Stock Purchase Agreement with Tricorp on August 14, 2000 by which Tricorp would purchase six million shares of stock in the surviving entity for a total payment of $6 million. (Transcript at 91; Joint Exhibit No. III.) This, despite the fact that, prior to accepting Tricorp's proposal, P. Massey was presented with a proposal from another potential investor, Sovereign Capital, that would have provided more money to the

Company and less to the Myca shareholders.  Not surprisingly, the Myca shareholders elected to forego the proposed deal with Sovereign Capital and pursue the more personally lucrative Tricorp deal.  (Transcript at 202, 255-257.)

With only the promise of outside funding in hand, the Defendants insisted upon closing the Merger, and the text from paragraph 12(c) of the Merger Agreement was deleted and replaced by the following language found in paragraph 5 of the Closing Agreement:

> . . . . Upon the first payment of $3,000,000, as described in the Purchase Agreement, provided that Tricorp does not restrict the Bad Toys' use of funds in any way, (i) the Lunans shall receive payment of $300,000, of which $150,000 shall be paid to the Lunans and $150,000 of which shall be placed in escrow pursuant to the Escrow Agreement of even date herewith; and (ii) each shareholder of Mycom Group shall receive $200,000 or all of the shareholders of Mycom Group shall receive $800,000 in the aggregate.

(Joint Exhibit No. II, Paragraph 5.)

Tricorp defaulted under the terms of the Stock Purchase Agreement dated August 14, 2000.  (Transcript at 106.)  However, neither Myca, nor its shareholders, officers, or directors sought to legally enforce the Stock Purchase Agreement after the default.  (Transcript at 195.)

After Tricorp's default, in October 2000, Mycom was required to submit audited financial statements to the United States Securities and Exchange Commission (the "SEC") as part of a periodic report required of public companies.  (Transcript at 106-107, 258.)  In anticipation of this filing, P. Massey and Seipelt contacted Mr. Lunan expressing concerns that the payment owing to the Lunans negatively impacted the presentation of Mycom's financial status, and therefore, requested that the Lunans consent to the conversion of Mycom's $300,000 obligation from a due and owing obligation to a contingent obligation.  (Transcript at 107.)  The Lunans refused to consent to such conversion and provided Mycom with examples of the appropriate

presentation in Mycom's financial statements showing the $300,000 payment as a due and owing obligation. (Transcript at 107-109; Plaintiffs' Exhibit No. 46.) However, Mycom eventually submitted its audited financial statements to the SEC without <u>any</u> reference to a payment owing to the Lunans. (Transcript at 258.)

According to the testimony of Seipelt, Mycom decided not to report payment to the Lunans as a liability in its financials in part on the basis of an opinion letter rendered by Neil Ganulin, Mycom's attorney. (Transcript at 250.) However, Mr. Ganulin's opinion letter does not definitively state that Mycom owed no payment to the Lunans, but instead merely states that *it would be reasonable for Mycom to take the position that* it does not have an obligation to pay Mr. Lunan. (Transcript at 251.) Additionally, Mr. Ganulin's opinion letter explicitly states that the conclusions expressed therein were premised on the assumption that the parole or oral evidence regarding negotiations of the Closing Agreement would support Mycom's contention that it did not agree to pay Mr. Lunan $300,000 within one year of closing. (Transcript at 252.)

Seipelt, as acting CFO of Mycom, coordinated the audit process and corresponded with Mycom's independent auditors regarding whether Mycom's financial statements should reflect an obligation to the Lunans. (Defendants' Exhibit No. 501; Transcript at 233.) However, despite his title and position with Mycom, Seipelt refused to accept responsibility at trial for the filing of these financial statements that omitted the payment owing to the Lunans. (Transcript at 258-259.) As Seipelt testified, he understood the Closing Agreement to require payment to the Lunans if Tricorp *or a funding source other than Tricorp* funded Mycom. (Transcript at 259.)

Interestingly, the Myca shareholders never shared Mr. Ganulin's opinion letter with the Lunans. (Transcript at 267.) In fact, after receipt of Mr. Ganulin's opinion letter and after

8

signing off on the financial statements that omitted to record a payment owing to the Lunans, P. Massey and K. Hall boldly continued to press the Lunans to pay the debts of Bad Toys (now Mycom) using the promise of an eventual $300,000 payment as an inducement, while at the same time knowing that Mycom had taken the position in its SEC filing that it owed no obligations to the Lunans.  (Transcript at 106-107.)

After the closing of the Merger and after Tricorp defaulted on its Stock Purchase Agreement, the Myca shareholders looked for outside funding of a sort that would benefit them personally, with no payment to the Lunans.  Beginning in mid-to-late September 2000, Mycom began negotiations with Bobbitt & Bransom, Inc. d/b/a Broughton International, resulting in a merger of the two companies in April 2001.  (Transcript at 196.)  As part of this merger, the four original Myca shareholders sold a combined total of Twenty-Seven Million (27,000,000) shares of their personal Mycom stock to Broughton Acquisition, LLC, for the aggregate consideration of $1,108,669 paid to the Myca shareholders as follows:  $272,167.58 to P. Massey, $217,734.06 to A. Massey, $293,940.98 to Carroll, and $324,827.68 to Young.  (Transcript at 199-200.)  The Lunans did not participate in or receive any payments as a result of the transaction between the Myca shareholders and Broughton & Bransom.   (Transcript at 110.)   As no matter of coincidence, the difference between the total consideration received by the Myca shareholders in the transaction with Broughton & Bransom, Inc. and the total consideration the Myca shareholders would have received pursuant to the Merger Agreement and Closing Agreement with Bad Toys is approximately $300,000, the amount of the payment owed to the Lunans. (Transcript at 202.)

J M-D 63581 v1
0-0  10/05/2004

Despite Mycom's stated position that it owes nothing to the Lunans since the Tricorp default, P. Massey and Ken Hall, acting on behalf of Mycom and its shareholders, officers and directors, promised Mr. Lunan that the Bobbitt & Bransom merger would yield payment to the Lunans of $300,000.  (Transcript at 106, 109-110.)  These promises were, again, made in conjunction with requests for Mr. Lunan to complete payment of Bad Toys' pre-merger debts. (Transcript at 106-107.)

The Lunans have never received any consideration in return for the debt-free public company they built.  Instead, as a result of the Merger, and as confirmed by the testimony of P. Massey, the Lunans went from holding the majority of the outstanding freely-tradable shares in a un-profitable publicly-traded corporation to becoming minority shareholders holding restricted shares in a un-profitable publicly-traded corporation.  (Transcript at 177.)  In contrast, Mycom and its shareholders, officers and directors have accepted substantial benefits resulting from the Merger.

## II. <u>ARGUMENT</u>

### A.  *Breach of Contract*

In order to recover on their breach of contract claim, the Lunans simply must have presented evidence at trial sufficient to establish the existence of a contract between the Lunans and Mycom, performance by the Lunans, breach by Mycom, and resulting damages to the Lunans.  <u>Doner v. Snapp</u>, 649 N.E.2d 42 (1994).  It is clear from the evidence produced at trial that a valid agreement did exist between the Lunans and Mycom, based on oral and written representations, indicating that the Lunans were to receive a total of $300,000 as consideration for their performance under the Merger and Closing Agreements.  Defendant Mycom breached its agreement with the Lunans when it abandoned this agreement and refused to pay the Lunans as represented.   As a direct result of Mycom's breach, the Lunans have suffered substantial compensatory damages in an amount exceeding $300,000.

There is no dispute that a contract existed between the Lunans and Mycom.  Also, there is no assertion by Defendants that the Lunans failed to perform their part of the bargain in the deal. In fact, its clear from the testimony at trial that Mycom's shareholders, directors, and officers continuously encouraged and even pressured the Lunans to fully perform under the Merger and Closing Agreements.  (Transcript at 68-69, 182-183.)  This, despite Mycom's undisputed failure to pay the Lunans a total of $300,000 as agreed in the transaction.

Mycom's obligation to pay the Lunans a total of $300,000 as consideration for the deal is disputed by the Defendants who rely upon the language of the Closing Agreement as decisive with regard to this issue.  However, as the Court has already held, the Closing Agreement is ambiguous in its attempt to address the payment of $300,000 for the benefit of the Lunans as

11

consideration in the Merger and simply does not represent the complete and unambiguous understanding of the parties. (See Order Denying Summary Judgment.) The Closing Agreement does not contain an integration clause providing that the Agreement represents the full and final understanding of the parties and that no other oral or written agreements exist. (Joint Exhibit No. II.)  The fact that Mycom's attorney, Mr. Ganulin, in his opinion letter recognizes that oral evidence will have a bearing on the conclusion as to the status of the payment to the Lunans further demonstrates that the Closing Agreement is ambiguous.  (See Transcript at 252.) Moreover, the Closing Agreement absolutely **does not** specifically state that payment of $300,000 for the benefit of the Lunans is contingent upon receipt of funding by Tricorp or any other event.  (Joint Exhibit No. II.)

Accordingly, this Court must determine, based on the evidence offered at trial, the true intent of the parties with regard to the payment of consideration to the Lunans.  It is clear from the evidence that the parties intended for the Lunans to be paid, regardless of whether or not Tricorp provided the funding for said payment.  Certainly, Mr. Lunan clearly testified that this was his intent and understanding.  (See Transcript at 122, 129)  The argument asserted in the Defendants' Post-Trial Brief that Mr. Lunan's testimony was in conflict on this point is misleading.  The Defendants' Brief at the top of page 2 points out that Mr. Lunan testified Seipelt told him that he would not be paid $300,000 in the transaction.  However, the Defendants fail to mention Seipelt's testimony that when Seipelt communicated his position that the Myca shareholders were paying too much for the deal, Mr. Lunan made it very clear that he would not close the deal if he did not receive a total of $300,000.  Seipelt testified that Mr. Lunan was adamant, *to the point of leaving the room and slamming the door*, that unless he received

12

$300,000, he was not going to go through with the merger.  (See Transcript at 248-249)  Further, it is clear from Mr. Lunan's communicated skepticism regarding the likelihood of the success of the private placement proposed by the Myca shareholders that he would not have agreed to make the consideration he was to receive for his public company contingent on the success of such a plan.  (See Transcript at 44-46.)

In fact, it was the testimony of P. Massey and the other Myca shareholders, directors, and offers that was completely inconsistent regarding the consideration to be paid the Lunans in the Merger transaction.  P. Massey, who was the lead Myca shareholder participating in negotiations with the Lunans and Bad Toys, testified that, pursuant to the terms of the Closing Agreement as executed, if funding from a source other than Tricorp was obtained after the closing, the Lunans would still be paid $300,000.  (Transcript at 197.)  Seipelt also independently echoed this as his understanding and intent.  (Transcript at 259.)  Moreover, the fact that P. Massey and Seipelt sought the consent of the Lunans to change the characterization of the $300,000 payment from one that was due and owing to one that was contingent further demonstrates the fact that the obligation was regarded by both parties as due and owing without contingency.  (See Transcript at 106-109.)  Finally, it only makes sense that the parties intended for the Lunans to receive $300,000 as sufficient consideration for the transaction, regardless of whether Tricorp actually funded the company, since, without payment of *some sufficient consideration*, there would be no enforceable contract.

It is also worth noting that, evidence of the parties' conduct and admitted understandings after execution of the Closing Agreement is admissible to show modification of the prior written agreement.  See Gerwin v. Clark, 363 N.E.2d 602 (Ohio Ct. App. 1977).  As such, even if the

13

original intent of the parties at the time of the closing was for payment to the Lunans to be made from the specific funding obtained from Tricorp, the conduct and admitted understandings of P. Massey and the other officers, directors, and shareholders of Myca demonstrate that this intent was at least at some point modified.

### B. Fraud

To establish a claim of fraud a plaintiff must show (a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance.  Russ v. TRW, 570 N.E.2d 1076, 1083 (Ohio 1991).

The individual Defendants herein each intentionally and maliciously made false representations to Mr. Lunan regarding payment of $300,000 to the Lunans in consideration for the Merger.  Specifically, Mr. Lunan was told by these individual Defendants, subsequent to the closing of the Merger, that the Lunans would be paid $300,000 as agreed if the Lunans extinguished the debt owed by Mycom to the Lunans and others after the merger transaction. (See Transcript at 97-98; 123-128; 182-183.)

The above false representations were made even though the Defendants knew that Mycom would not pay the Lunans $300,000 as agreed.  Additionally, the above false representations were made with the intent to induce the Lunans to incur substantial expense in extinguishing substantial debt owed by the Defendant Mycom to the Lunans and others.  Both

before and after the Closing Agreement was executed, P. Massey, Seipelt, and Ken Hall repeatedly pressed Mr. Lunan to pay the debts of Bad Toys with the $300,000 payment used as an inducement. (Transcript at 97-98,182-183.)

The Post-Trial Brief offered by the Defendants asserts on page 11 that "Plaintiffs were told by the Defendants that he would not receive his $300,000 unless funding was obtained," but conveniently fails to include a cite to any such testimony at trial. In fact, the testimony at trial clearly indicated the opposite, that the Lunans were never told by Defendants that they would not be paid for their company. (See Transcript at 267-268.) Un-contradicted testimony indicating that the Defendants even failed to share with the Lunans their counsel's opinion letter solicited on the issue of payment to the Lunans further indicates no such representation was ever made to the Lunans. (See Transcript at 267-268.)

The Defendants further assert on pages 11 and 12 of their Post-Trial Brief that Mr. Lunan should have known from P. Massey's single trip to the west coast in an "effort" to obtain $6 million in outside funding that outside funding was "vital" to the transaction. Such an assumption is without reason. It would only stand to reason that funding for a $6 million Private Placement Memorandum ("PPM"), if "vital" to the transaction, would have warranted more of an "effort" on the part of P. Massey. In fact, P. Massey testified that she only spent a few days in the field, her one trip to the west coast, in an attempt to secure this financing. (See Transcript at 179.) Moreover, if outside funding was "vital" to the transaction, why would P. Massey forego a perfectly legitimate source of funding from Sovereign Capital in favor of a deal with Tricorp, with virtually no effort to confirm the legitimacy of Tricorp as a funding source through normal due diligence efforts and, even more, why would P. Massey lie about her diligence efforts,

15

claiming that this task was delegated to her counsel, Neal Ganulin, a fact Mr. Ganulin flatly denied?

The Lunans reasonably relied upon the above referenced false representations to their detriment by extinguishing substantial debt owed by the Defendant Mycom to the Lunans and others. Based on representations made by the individual Defendants herein, both prior to and after the closing of the Merger, indicating that payment of $300,000 to the Lunans was forthcoming, the Lunans performed their obligations under the Merger Agreement and the Closing Agreement, including paying the pre-merger debt of Bad Toys. (Transcript at 97-98, 123-128, 182-183.) Accordingly, the Lunans have suffered significant monetary damage as a result of their reasonable reliance upon the Defendants' false representations, and should, therefore, recover for the Defendants' fraudulent conduct.

### C.  Unjust Enrichment

Unjust enrichment is a concept within contract law that operates to prevent an injustice when one party retains the benefit of another party's efforts without paying fair compensation. See Fairfield Ready Mix v. Walnut Hills Associates, Ltd., 572 N.E.2d 114 (1961). As the Defendants point out in their Post-Trial Brief, an action for unjust enrichment is appropriate where a party retains money or a benefit that in equity or justice belongs to another. Eyerman v. Mary Kay Cosmetics, Inc., 967 F.2d 213, 222 (6th Cir. 1992) (citing Hummel v. Hummel, 14 N.E.2d 923, 926-27 (1938). However, in stark contrast to the assertions of the Defendants in their Post-Trial Brief, the doctrine of unjust enrichment does have application when an express contract exists concerning the services for which compensation is sought, *if the transaction*

J M-D 63581 v1
0-0  10/05/2004

*involves fraud, bad faith, or illegality.* <u>Howland v. Lyons</u>, 2002 WL 3636299, No. 77870 at *3 (Ohio Ct. App. Mar. 7, 2002) (citations to reported cases omitted).

The Defendants' acceptance of the substantial benefits resulting from the Merger, despite their refusal to pay the Lunans as agreed, has resulted in an unjust enrichment to the Defendants. The Defendants received control of a debt-free publicly-traded company and have paid no consideration for its shares. In contrast, the Lunans no longer have control over the public company they built and are in the undesirable position of being minority shareholders with shares that were not freely-transferable due to transfer restrictions imposed thereon as a result of the Merger. Additionally, the Defendants received and accepted a substantial benefit from the Lunans when the Lunans extinguished substantial debt owed by the Defendant Mycom to the Lunans and others before and after the Merger. Defendants have recognized the benefit conferred upon them by the Lunans by representing that the Lunans would be paid $300,000 for the same.

The Defendants' acceptance of the aforementioned benefits was made under such circumstances that it would be inequitable for Defendants to retain said benefits without payment of the value thereof. The Defendants' acted fraudulently, or at least in bad faith, when they attempted to change the terms of the Merger in the last weeks before closing and inserted an attempted limited payment option involving the anticipated Tricorp funding and when no enforcement was sought against Tricorp upon its default. Instead, Mycom entered into a merger with Bobbitt & Bransom wherein P. Massey, A. Massey, Carroll, and Young each personally prospered from the sale of their Mycom shares. Additionally, the Defendants acted fraudulently,

as detailed above, in their continued promises to pay the Lunans as agreed, regardless of outside funding, with no intent to do so.

By omitting certain portions of Mr. Lunan's testimony from their Post-Trial Brief, Defendants have attempted to hide the actual financial harm Mr. Lunan suffered as a result of the transactions between Bad Toys and Defendants.  In their Post-Trial Brief, Defendants attempt to avoid liability for unjust enrichment by asserting that Mr. Lunan actually benefited from the Merger through his receipt of proceeds from the sale of his shares of Mycom and Bad Toys stock. (Defendants' Post-Trial Brief at p. 6 and p. 13).  Defendants claim that the stock price of these shares rose substantially on the news of the Merger and that Mr. Lunan sold his stock at these increased prices for a total sales price of approximately one million dollars. (Defendants' Post-Trial Brief at p. 6. and p. 13)  In support of their argument, Defendants offer the following testimony of Mr. Lunan:

> The Court: Out of the shares from these three companies we've been talking about, that you've sold shares and received approximately a million dollars for them?
>
> The Witness: That's Correct.

(Transcript p. 148).  However, portions of Mr. Lunan's testimony not included in Defendants' Brief regarding (1) what Mr. Lunan did with the proceeds he received from the sale of his stock, and (2) the actual sales price of a substantial portion of the stock he sold, refute Defendants' claims.  Perhaps the most telling omission from Defendant's Post-Trial Brief is the exclusion of Mr. Lunan's full statement in response to the Court's question referenced above.  In addition to "That's correct," Mr. Lunan also stated, "And I wrote off a million in loans.  I didn't come out real good." (Transcript at P. 148.)  Defendants' Brief ignores Mr. Lunan's testimony that

approximately $700,000 of the one million dollars he received from the sale of his stock was loaned to Bad Toys and was never repaid.  Mr Lunan testified as follows:

> The Court: Now, do you understand how much capital you raised on the sale of those shares or was --
>
> The Witness: Oh, sure.
>
> The Court: -- was the capital given to you directly?
>
> The Witness: No.  When I sold the shares, we sold about $800,000 worth of shares, okay, and we put into the company about 700.  I think on the tax return it's 690,000.
>
> The Court: That was a loan back to the Company?
>
> The Witness: A loan which we used to convert for assets.

(Transcript at 137.)    Therefore, approximately $700,000 of the one million dollars that Defendants' claim benefited Mr. Lunan was channeled into Bad Toys in the form of a loan. Moreover, Mr. Lunan testified that he forgave close to one million dollars in loans made by him to Bad Toys on the promise of the Merger Agreement being consummated and on the promise of his receipt of the $300,000 payment. (Transcript at 49-50.)  Consequently, $700,000 of the one million dollars he received from the sale of stock did not fill Mr. Lunan's personal coffers, but instead was used to make Bad Toys an acceptable merger candidate for Myca.

Additionally, Defendants' Brief ignores Mr. Lunan's testimony that while his cost basis in his stock was $.14 per share (Transcript at p. 275), he sold a substantial portion of his stock at a sales price of $.02 to $.03 per share after the expiration of the restrictions in the lockdown dribble agreement imposed on him by Defendants. (Transcript at p. 147-148.)  Therefore, of the remaining $300,000 Mr. Lunan received from the sale of his stock, $200,000 of that sum represents a substantial loss to Mr. Lunan on his investment in Bad Toys.

19

Accordingly, the Defendants are liable to the Lunans for the value of the benefits each received from the Lunans and accepted without payment, thereby resulting in an unjust enrichment to the Defendants.

### D. Promissory Estoppel

A claim of promissory estoppel involves three elements: (1) a clear, unambiguous promise; (2) reasonable and foreseeable reliance upon the promise by the person to whom the promise is made; and (3) resulting injury to the party who relied on the promise. McCroskey v. State, 456 N.E.2d 1204 (Ohio 1983).

The Defendants' promises to the Lunans that Mycom would pay the Lunans $300,000 as agreed were such that the Defendants should have known that said promises would induce the Lunans to take action in reliance upon the same.  Moreover, the Lunans did reasonably act in reliance upon said promises to their detriment by extinguishing substantial debt owed by Mycom to the Lunans and others, by consenting to the imposition of restrictions on their ability to trade their shares of Mycom stock, and by giving up control of the publicly-traded company they had built.

The pre-Merger debt of Bad Toys and the expenses of Mycom paid by the Lunans together equaled approximately $300,000.  (Transcript at 49.)  As Mr. Lunan testified, the Lunans would never have agreed to pay Bad Toys pre-merger debt or other obligations of the surviving entity, Mycom, if Mr. Lunan had not repeatedly been promised payment of $300,000. (Transcript at 98.)  Furthermore, it is clear from Mr. Lunan's communicated skepticism regarding the likelihood of the success of the private placement proposed by the Myca

shareholders that he would not have agreed to make the consideration he was to receive for his public company contingent on the success of such a plan.  (See Transcript at 44-46.)

Additionally, just prior to the closing of the Merger, Ken Hall, acting on behalf of the Myca shareholders, officers and directors, induced the Lunans to agree to return 500,000 shares of stock and enter into a lockdown and dribble agreement restricting the future sale of shares by the Lunans based on the company's continued representation that the Lunans would be paid $300,000 as consideration in the deal.  (Transcript at 103-104.)  Mr. Hall went so far as to call the Lunans "greedy" if they wouldn't agree to the give back of 500,000 shares since they would receive a total of $300,000 in cash.   (Transcript at 69.)   The restrictions imposed by the lockdown and dribble agreement prevented the Lunans from selling any of their shares in Mycom prior to November 2001 (Plaintiff's Exhibit No. 2 at Paragraph 2), and because the Lunans would have sold their stock in Mycom prior to this date but for such restrictions, the lockdown and dribble agreement cost the Lunans between $500,000 and $1,500,000 (Transcript at 104-105).

In reliance upon the numerous representations made by the Defendants, the Lunans have incurred to their detriment great expense in the forgiveness and pay-off of Bad Toys debt, the costs of the merger transaction, and restrictions on the transfer of Mycom shares held by the Lunans.  In an effort to facilitate the closing of the Merger, the Lunans paid other obligations of Mycom at the request of the Defendants, including but not limited to SEC registration fees and audit fees, in reliance upon representations made by the Defendants that the Lunans would be paid $300,000.  (Transcript at 66-67.)

21

Enforcement of the promises made by the Defendants is necessary to avoid substantial injustice. Therefore, the Defendants are liable to the Lunans for the loss the Lunans suffered in reasonable reliance upon said promises based on the equitable theory of *promissory estoppel*.

### E.  Civil Conspiracy

The tort of civil conspiracy is a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages. Williams v. Aetna Fin. Co., 700 N.E.2d 859 (Ohio 1998). It is clear from the evidence presented at trial that each of the individual Defendants engaged in a malicious combination to injure the Lunans by conspiring to fraudulently induce the Lunans to extinguish debt on behalf of Mycom. The Lunans have suffered substantial economic loss as a result of the Defendants' conspiracy to commit fraud and conspiracy to intentionally interfere with a contract, and should recover for their losses.

Respectfully Submitted,

  /s/ Steven H. Trent
Steven H. Trent, Esq. (TN BPR No. 016322)
Matthew D. Davison, Esq. (TN BPR No.020049)
Baker, Donelson, Bearman, Caldwell & Berkowitz
207 Mockingbird Lane
P.O. Box 3038
Johnson City, Tennessee 37602
(423) 928-0181
Fax:  (423) 928-5694
E-mail:  strent@bakerdonelson.com

Attorneys for Plaintiffs
Larry Lunan and Susan Lunan

22

<u>Certificate of Service</u>

I hereby certify that on October 5, 2004, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Stephen A. Watring
Dunlevey, Mahan & Furry
110 North Main Street, Suite 1000
Dayton, Ohio  45202-1738

James M. Moore
Lindhorst & Dreidame
312 Walnut Street, Suite 2300
Cincinnati, Ohio  45202-4091

23