IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

LARRY LUNAN AND SUSAN LUNAN,

        Plaintiffs

        v.                      C-1-01-425

MYCOM GROUP, INC., a Nevada
Corporation, PATRICIA A. MASSEY,
G. ALLAN MASSEY, GEORGE W. YOUNG,
JOAN CARROLL, KENNETH R. HALL
AND TERRY SEIPELT,

        Defendants

## ORDER

This matter is before the Court for judgment on the merits after a trial to the Court.  The Lunans are husband and wife and were the principal shareholders, officers and directors of Bad Toys, Inc. ("Bad Toys"), a publicly traded motorcycle company headquartered in Kingsport, Tennessee.  Defendant Mycom Group, Inc. ("Mycom") is a corporation existing under the laws of the State of Nevada which is authorized to do business in Ohio and is the surviving entity of the merger between Bad Toys and Myca Group, Inc. ("Myca"), a privately held technology company headquartered in Cincinnati, Ohio.  Defendants Patricia A. Massey ("P. Massey"), G. Allan Massey ("A. Massey"), George W. Young ("Young") and Joan Carroll ("Carroll") were the sole shareholders, officers and directors of Myca prior to the merger and were the majority shareholders, officers and directors of Mycom subsequent to the merger which occurred on August 23, 2000.

2

The Lunans were introduced to Myca and its shareholders, officers and directors ("P. Massey, A. Massey, Young, Carroll) by Kenneth R. Hall[1] and Lunans' attorney Thomas Kenan on or about November, 1999.  At the time, the Lunans were interested in a potential reverse merger.  The Lunans developed Bad Toys as a public company for the purpose of selling it to a private company wishing to go public.  Bad Toys was not a commercial success.  The Lunans loaned Bad Toys approximately $900,000 over the years it existed.  Even though it had not sold one motorcycle, Bad Toys was a publicly traded company and a merger candidate. Discussions between the corporations led to the signing of the Plan and Agreement of Merger between Bad Toys and Myca dated March 31, 2000 (the "Merger Agreement").  The transaction initiated by the Merger Agreement was eventually consummated pursuant to the Stock Purchase Agreement executed on or about August 14, 2000 by Mr. Lunan as President of Bad Toys and the Closing Agreement dated August 23, 2000.

The Merger Agreement contemplated a private placement offering to be initiated promptly after execution of the Merger Agreement and funded before the closing of the merger.  The Offering Memorandum issued by Bad Toys on June 2, 2000 represented to the market that no fewer than 2,300,000 shares and no more than 6,000,000 shares at the purchase price of $1.00 per share would be offered for sale.

---

[1] Defendant Kenneth R. Hall and plaintiffs settled their differences and he has been dismissed.

3

The reasons Myca and the Myca shareholders agreed to the Merger Agreement was to provide a capital infusion to the business of Mycom without losing control of their corporation. The Lunan's reason was to increase their net worth. The private placement offering at Paragraph 12(c) of the Merger Agreement originally provided:

> The net proceeds of the [private placement] offering shall be used by Bad Toys as follows: (i) $800,000 shall be the cash portion of the consideration paid to the Myca Group shareholders in connection with the Merger as described [herein], (ii) $150,000 shall be paid to Bad Toys Sub to pay existing Bad Toys debt, (iii) $150,000 shall be paid to the Lunans (together with all the Bad Toys Sub outstanding common stock) to extinguish all remaining debts of Bad Toys owed to the Lunans, and (iv) $900,000 shall be retained by Bad Toys for product and service development. . . .

Prior to executing the Merger Agreement, Larry Lunan as President of Bad Toys believed the private placement proposed by the corporations was unlikely to succeed, as it provided that only approximately one-half of the total proceeds of the proposed private placement would be used to fund the business of Bad Toys while the other one-half of the proceeds would go into the pockets of the shareholders of the corporations. Based on his twelve years of experience as a financial professional, Mr. Lunan knew that while investors may have been interested in funding product development efforts, no investor would desire to give his or her money to the shareholders to be used for their personal benefit.

4

5

In spite of his knowledge and experience, Mr. Lunan, as President of Bad Toys, agreed to proceed and execute the Merger Agreement understanding that unless a minimum of $2,000,000 was raised by private placement prior to the closing of the merger, the merger would not close.  His concerns proved correct.  As of the first of August, Bad Toys had failed to raise $2,000,000 from its Offering Memorandum.  In fact, no subscription pursuant to the Offering Memorandum was received.   On or about August 14, 2000, the corporations entered into a Stock Purchase Agreement with Tricorp Financial, Inc. ("Tricorp") which did not comply with the private placement Offering Memorandum.   In the Stock Purchase Agreement, Tricorp agreed to buy 6,000,000 shares at $1.00 per share, however, no money was to be paid to Bad Toys until after the closing.  It was the duty of the officers and directors of Bad Toys, who at the time were the Lunans and Roger A. Warren, to protect the shareholders of Bad Toys and to perform this duty with due diligence by investigating the legitimacy of Tricorp's commitment to purchase six million shares of stock for $6 million before accepting the Tricorp deal and issuing 6,000,000 shares of Bad Toys to Tricorp.  In this regard, the Lunans accepted the recommendation of Tom Kenan the attorney for Bad Toys, that Tricorp was reliable and the Lunans should enter into the Stock Purchase Agreement, amend the Merger Agreement and close the merger.

6

The Lunans delivered 6,000,000 shares of Bad Toys to Tricorp on or about March 14, 2000 and closed the Merger Agreement with only Tricorp's promise to pay for the stock at a future time after the closing.  This agreement did not comply with the terms of the Merger Agreement dated March 31, 2000 or the Offering Memorandum issued June 2, 2000; therefore, the corporations and the parties agreed to delete paragraph 12(c) of the Merger Agreement and replace it by the following language found in paragraph 5 of the Closing Agreement:

> . . . . Upon the first payment of $3,000,000, as described in the Purchase Agreement, provided that Tricorp does not restrict the Bad Toys' use of funds in any way, (i) the Lunans shall receive payment of $300,00, of which $150,000 shall be paid to the Lunans and $150,000 of which shall be placed in escrow pursuant to the Escrow Agreement of even date herewith; and (ii) each shareholder of Mycom Group shall receive $200,000 or all of the shareholders of Mycom Group shall receive $800,000 in the aggregate.

(Joint Exhibit No. II, Paragraph 5).

Though no fault of Mycom, the Lunans, or the individual defendants, Tricorp defaulted under the terms of the Stock Purchase Agreement dated August 14, 2000.  After Tricorp defaulted, the Lunans, Kenneth R. Hall and Mycom searched for equity funding for Mycom.  On October 19, 2000, by an agreement among Kenneth R. Hall, Mr. Lunan and the defendants except Terry Seipelt, Kenneth R. Hall agreed to purchase twenty-seven million shares of common stock of Mycom after which Hall agreed to transfer 1,200,000 shares to Mr. Lunan from the purchased shares.  As with the first transaction in November 1999, this transaction

7

failed.  Mycom received no capital infusion from this failed transaction.   No equity capital has been raised for the post–merger corporation at any time pertinent to the issues before the Court.

After Tricorp's default, in October, 2000, Mycom was required to submit audited financial statements to the United States Securities and Exchange Commission (the "SEC") as part of a periodic report required of public companies. The statement in the record (Ex. 32) was filed August 14, 2001.  Because the payment of the $300,000 would be due and owing only if the $3,000,000 was paid to Mycom, the obligation was a contingent obligation.

Additionally, Mycom was advised that the payment to the Lunans was a contingent liability in an opinion letter rendered by Neil Ganulin, Mycom's attorney.  Mr. Ganulin's opinion letter states that ". . . .it is reasonable for Mycom to take the position that it does not have an obligation to pay Mr. Lunan, . . . and even if it has an obligation to pay Mr. Lunan $300,000, that obligation is contingent upon Mycom having successfully completed a private placement of at least $3,000,000."

After the closing of the merger and after Tricorp defaulted on its Stock Purchase Agreement, Mycom looked for equity capital.  Beginning in mid–to–late September, 2000, Mycom began negotiations with Bobbitt & Bransom, Inc. d/b/a Broughton International, resulting in a merger of the two companies in April, 2001 after the October 19, 2000 Kenneth R. Hall deal failed to close.  As a result of this

8

merger, the four original Myca shareholders lost control of their company by selling a combined total of Twenty–Seven Million (27,000,000) shares of their personal Mycom stock to Broughton Acquisition, LLC, for the aggregate consideration of $1,108,669 paid to the Myca shareholders as follows: $272,167.58 to P. Massey, $217,734.06 to A. Massey, $293,940.98 to Carroll, and $324,827.68 to Young.  The Lunans did not sell any of their stock to Broughton or receive any payment as a result of the transaction between Mycom and Broughton & Bransom.

The Lunans have received the consideration bargained for in the Merger Agreement as amended by the Closing Agreement.

In the Closing Agreement, the Lunans waived the successful completion and consummation of the Private Placement on or prior to the Closing Date as a condition precedent to the closing and rights to receive any of the proceeds of such Private Placement.  No private placement has taken place.  The parties intended that the payments of the moneys by Tricorp was a condition precedent to Mycom's obligations to pay $300,000 to the Lunans.  Tricorp paid no money, but did return the 6,000,000 shares of stock.

9

It was the Lunans' nondelegable duty as officers and directors of Bad Toys on or about  August 14, 2000 to protect Bad Toys by assuring themselves it was probable that Tricorp would keep the promise to pay $6,000,000 at a future time before the 6,000,000 shares of Bad Toys were transferred to Tricorp on or about August 14, 2000 by Mr. Lunan.  In fulfilling this duty, the Lunans relied on the recommendation of Tom Kenan, Bad Toys lawyer, not the defendants.

In conclusion, after examining the documents, the witnesses and their trial testimony, the Court concludes the parties intended the payment of $300,000 to the Lunans was contingent on the receipt of some payment by Mycom from Tricorp for the 6,000,000 shares of stock Tricorp received on or about August 14, 2000. Tricorp made no payment.  They did return the shares.  Defendants owed no payment to the Lunans.

In its Order denying summary judgment for the defendants (doc. no. 42), the Court discussed the law applicable to this case and will not reiterate that discussion here.  Because conflicting evidence was presented by the parties, the Court could not resolve the case without a trial.  The trial has been held.  Pursuant to all the foregoing, the Court concludes plaintiff has failed to establish by the preponderance of the evidence that defendants breached the Merger Agreement as amended by the Closing Agreement in any manner or committed any actionable act or omission whatsoever.

10

On August 25, 2005, Plaintiffs filed their Motion for a Status Conference (#66).

Pursuant to the foregoing, the case has been terminated on the docket of this Court. Therefore, the Motion is DENIED as MOOT.

On January 18, 2002, the Court granted the Defendant's Unopposed Motion to Stay Proceedings in Case Number C–1–01–533 Lunan, et al, plaintiff vs Kenan, defendant. In the Order, plaintiff was granted leave to move to reinstate the case at such time as they deem it appropriate. The Court suggests it may be an appropriate time for plaintiffs' to make such a request by Motion with service to the defendant in Case Number C–1–01–553.

Judgment is therefore entered in favor of the defendants against the plaintiffs on all claims. This case is **DISMISSED WITH PREJUDICE** and **TERMINATED** on the docket of this Court at plaintiffs' costs.

**IT IS SO ORDERED.**


                                        S/Herman J. Weber
                                    Herman J. Weber, Senior Judge
                                    United States District Court